**Elizabeth MESCANTI, Appellee**

v.

**William M. MESCANTI, Appellant.**

Superior Court of Pennsylvania.

Argued June 11, 2008.

Filed Aug. 29, 2008.

Anne D. Matlawski, Broomall, for appellant.

Penelope A. Boyd, West Chester, for appellee.

BEFORE: FORD ELLIOTT, P.J., ALLEN and KELLY, JJ.

OPINION BY ALLEN, J.:

¶ 1 William M. Mescanti ("Husband") appeals from the order of the trial court granting a final protection from abuse ("PFA") order in favor of Elizabeth Mescanti ("Wife"). We affirm.

¶ 2 On October 9, 2007, Wife filed a PFA petition and a temporary order was entered granting her, *inter alia*, exclusive possession of the marital home and primary physical custody of the children. The order further directed Husband to

relinquish possession of all his guns. Following the filing of a formal PFA petition, a hearing was held on October 19, 2007. At the conclusion of the hearing, the trial court entered its final PFA order, which prohibited Husband from having any contact with Wife, granted Wife exclusive possession of the parties' marital home, granted Wife temporary custody of the children, granted Husband supervised visitation pending further custody proceedings, and prohibited Husband from possessing firearms. Except for the issue of the children's custody, the remaining provisions of the order were to remain in effect for three years. This timely appeal followed.[1] Both Husband and the trial court have complied with Pa.R.A.P. 1925.

¶ 3 Husband raises the following issues on appeal:

1. Did the Lower Court abuse its discretion when it relied upon testimony not in evidence with respect to the "cocking" of a gun in fashioning its Order?

2. Did the Lower Court err in granting the Petition as Wife failed to establish abuse under 23 [Pa.C.S.A.] § 6102(a)(2) or (5)?

 a. Was the evidence insufficient to establish reasonable fear of imminent serious bodily injury on the part of Wife?

 b. Was the evidence insufficient to establish Husband's knowing engagement in a course of conduct under circumstances which would place Wife in reasonable fear of bodily injury?

3. Did the Lower Court err in not allowing Husband to question Wife's state of mind or motive for filing the action when the Court sustained [Wife's] objection to the question of whether Wife would withdraw her petition if Husband agreed to leave the house?

Husband's Brief at 10.

¶ 4 As this Court has recently summarized:

As an initial matter, we note that, in a PFA action, we review the trial court's legal conclusions for an error of law or abuse of discretion. *Lawrence v. Bordner*, 907 A.2d 1109, 1112 (Pa.Super.2006). In *Commonwealth v. Widmer*, 560 Pa. 308, 322, 744 A.2d 745, 753 (2000), our Supreme Court defined "abuse of discretion" in the following way:

The term 'discretion' imports the exercise of judgment, wisdom and skill so as to reach a dispassionate conclusion, with the framework of the law, and is not exercised for the purpose of giving effect to the will of the judge. Discretion must be exercised on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions. Discretion is abused when the course pursued represents not merely an error of judgment, but where the judgment is manifestly unreasonable or where the law is not applied or where the record shows that the action is a result of partiality, prejudice, bias or ill will. *Id.* at 322, 744 A.2d at 753 (quoting *Coker v. S.M. Flickinger Co., Inc.*, 533 Pa. 441, 447, 625 A.2d 1181, 1184–85 (1993)).

*Custer v. Cochran*, 933 A.2d 1050, 1053–54 (Pa.Super.2007) (en banc). Credibility of the witnesses and the weight accorded

---

1. Although Husband filed a motion for reconsideration, it was not ruled upon prior to Husband filing his notice of appeal.

their testimony is within the exclusive province of the judge as fact finder. *Karch v. Karch*, 885 A.2d 535, 537 (Pa.Super.2005) (citation omitted).

 ¶ 5 Because in his first two issues Husband essentially challenges the sufficiency of the evidence supporting the trial court's final protection from abuse order we will address them together. When a claim is presented on appeal that the evidence is not sufficient to support an order of protection from abuse, the reviewing court must "view the evidence in the light most favorable to the verdict winner, granting her the benefit of all reasonable inferences." *Fonner v. Fonner*, 731 A.2d 160, 161–63 (Pa.Super.1999). The reviewing court then determines whether the evidence was sufficient to sustain the trail court's conclusions by a preponderance of the evidence. The preponderance of the evidence standard is "defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence." *Raker v. Raker*, 847 A.2d 720, 724 (Pa.Super.2004) (citation omitted).

¶ 6 The trial court summarized the testimony presented at the October 19, 2007, hearing as follows:

On October 7, 2007, Husband had completed the master suite at the parties' residence, a project that had spanned three years. Although the parties had been sleeping apart for three years and experiencing marital difficulties, Husband expected Wife to join him in the newly completed suite that night. Throughout the day, as the issue of where Wife would be sleeping remained unresolved, Husband conducted himself in an "unnice . . . cold" manner. Late in the day, Husband began to comment "Well, I hope this is what you really want. What are you doing here? Why are you home?" Closer to bedtime, Wife was in the front hall at her computer searching the internet for a place to move and mortgage rates and Husband kept approaching her from behind. Eventually, Husband announced to Wife that he would be in the new suite when she was ready to talk and that if she did not come in, he knew what that meant. Husband left Wife alone for about a half hour but then returned and told Wife "[t]his is going to get ugly" and "[t]his is just the tip of the iceberg." Despite these words, Wife turned off her computer and followed Husband to the basement when he chided her that while she was worried about what he could see when he looked over her shoulder at the computer, he had nothing to hide. In the basement, Wife sat next to Husband at his computer to watch what he was doing. Instead of working on his computer, Husband picked up a Verizon phone bill and began to rant and rave about the charges and made a vague threat to do something about it. The parties remained engaged about the phone bill with Husband pacing; Husband eventually left the house. While Husband was away from the house, Wife turned off the lights and went to bed in the living room, where she had been sleeping on a couch for months. When Husband returned he sat down in the living room and put on the television. Wife asked Husband to leave and to go watch television in the master suite. A short discussion ensued; Husband refused to leave the room. Wife turned off the television and Husband turned it back on. After several rounds, Wife unplugged the television. Husband called Wife a derogatory name and stormed out of the room. Wife lay on the couch until Husband stormed back into the room and turned on the lights. Husband then went to the computer in the front hall and turned on the comput-

er. Wife became concerned because Husband was trying to log on to the computer that only she and the children used; Husband would not tell her what he intended to do. Wife reached behind the computer and pulled out some cords to prevent Husband from logging on to the computer. At this point, the parties' fight escalated.

Wife: ... that is when he turned around and looked at me and said again an expletive and told me, you better not go to sleep. You better not even close your eyes, and he stormed out of the room, and I said, Oh, no. You are not [going] to threaten me because this has been an ongoing thing with him making me feel—"

Counsel: When he said, don't go to sleep, don't close your eyes to you what did you think he meant to do?

Wife: I know what he means to do. We have fought many times before and I have heard gun actions in the basement and asked him about it and he denies it. I know what that noise is. There is nothing else that makes that noise, and I have heard it and I thought for a long time he would kill me.

. . .

The Court: These noise[s] that you heard in the basement, did you know what they were?

Wife: Yes, I do.

The Court: What were the noises you heard?

Wife: It's a gun action like cocking a weapon [or] rifle.

. . .

Counsel: Did [Husband] have more than one gun in the house?

Wife: Yeah. He has a lot of guns in the house.

Counsel: And why do you think he intended—he might use the gun against you?

Wife: Because he doesn't want to let me go.

Wife called the police. While Wife was on the phone with the police, Husband came back upstairs, argued with Wife and then left the house. The incident ended with Wife leaving the house with the children after the police arrived.

Wife also described a pattern of harassment lasting for months. Because Wife works 7 p.m.–3 a.m. as an emergency room nurse, she sleeps during the day. Husband comes home from his job during the day to instigate arguments and fights. When Wife tries to leave to end the fight, Husband prevents her from going. ["He will block me and stand in front of me. He'll stand against the car and walk out behind me in the driveway so I can't leave. He says *mean things and wants to fight* with me all the time. And when I don't want to fight, he tells me, go curl up in your cocoon. That solves nothing. Things are going to get ugly."] Wife has been unable to sleep without interruption for months.

Husband has hacked into Wife's private e-mails on several occasions. He goes through Wife's pockets, cell phone logs, pocketbook and car. He has followed her when she is out with friends. He has stood and watched her while she is out. "He just has to have this control over me that he wants to hold onto." Husband writes Wife pages and pages expressing his love, his fear of losing her and his wish to stay together forever but "he doesn't change. He will say that and then he will turn around and do something else." Wife has told Husband that she wishes to separate from him and his reaction has been that he

does not want Wife to go, that "he doesn't want to be without me. That he can't be without me. He told me that even if it happened, he couldn't live anywhere near me because he knew that he would be back around me. When asked by her counsel "[a]re you afraid of [Husband]," Wife answered "yes." When asked by her counsel "[i]s there anything else you feel the Court should know about why you feel you should have a PFA," Wife answered "I just—I don't know what he is capable of. I don't know what he will do. I don't trust him at all. And I think that eventually he would do something to hurt me or kill me."

Wife recalled a specific incident in September, 2007 when she and Husband were fighting and she tried to leave the marital home only to find that neither her cell phone nor her keys were in the car where she had left them. When she tried to re-enter the house, Husband had locked her out. When Wife was able to re-enter the house with a spare key, she discovered that Husband had disconnected the phone lines. Wife then went back outside and observed Husband doing something under the hood of her car. Wife went into the house, lay on the couch and pulled the blankets over her.

Wife acknowledged that she had told Husband that she wanted a divorce on or about Memorial Day, 2007. Wife testified that initially it was her intention to separate and stay in the marital home so that she could continue to care for the children; however, she had recently been looking for a place to live. At the time of the hearing, Wife's intention to remain in the house was unclear; Wife could only state that "I am at the point I am not going to stay by [Husband]. I don't trust him." Wife has not filed for divorce because she is afraid of how Husband will react.

Trial Court Opinion, 1/11/08, at 3–6 (footnote and citations omitted).

¶ 7 "The purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." *Custer*, 933 A.2d at 1054 (citation omitted). The PFA Act defines "abuse" as follows:

### § 6102. Definitions

**(a) General rule.**—The following words and phrases when used in this chapter shall have the meanings given to them in this section unless the context clearly indicates otherwise:

**"Abuse."** The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

(1) Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.

(2) Placing another in reasonable fear of imminent serious bodily injury.

(3) The infliction of false imprisonment pursuant to 18 Pa.C.S.A. § 2903 (relating to false imprisonment).

(4) Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

(5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person,

without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S.A. § 6102(a).

¶ 8 Given the above factual summary, the trial court concluded that Husband has engaged in a course of conduct that reasonably placed Wife in fear of bodily injury and thus constituted "abuse" pursuant to 23 Pa.C.S.A. section 6102(a)(5). In its Rule 1925(a) opinion, the trial court explained:

> Given that for a period of months Husband had been provoking arguments with Wife, routing through her personal belongings and depriving her of sleep and had followed her when she was out with friends, locked her out of the marital home and prevented her from leaving the marital home all the while writing letters professing his love and acknowledging an obsession with her, Wife was in reasonable fear of bodily injury when she heard Husband cock a gun on October 7, 2007 following his threat "you better not go to sleep. You better not even close your eyes." A reasonable person, hearing these words during an argument followed by the sound of a gun cocking, would understand that a threat of bodily injury, if not death, had been made.

Trial Court Opinion, 1/11/08, at 7–8 (footnote and citation omitted).

■ ¶ 9 In his first issue on appeal, Husband asserts that the trial court abused its discretion in relying upon the fact that he cocked the gun on October 7, 2007, when Wife never testified that he did so on the night of the incident. According

to Husband, because the entry of the PFA order is supported by facts not in evidence, it must be vacated. We cannot agree. Although Husband characterizes Wife's hearing testimony as "rambling," Husband's Brief at 14–15, it is clear that Wife testified to past occasions when, after arguing with Husband, he would go to the basement and cock his guns in such a manner as to ensure Wife heard the noise. Thus, although the record does not support the trial court's statement that Husband cocked his gun following the argument on October 7, 2007, this fact does not affect the trial court's conclusion that Husband engaged in a course of conduct that placed Wife in reasonable fear of bodily injury.

■ ¶ 10 In his second issue, Husband asserts that the trial court erred in granting Wife's PFA petition because she failed to establish "abuse" as that term is defined under 23 Pa.C.S.A. section 6102(a)(2) and (a)(5). As the trial court notes in its opinion, Wife only sought a PFA order under section 6102(a)(5). Thus, we need not address Husband's claim with regard to Wife's burden of establishing abuse under section 6102(a)(2). With regard to section 6102(a)(5) we conclude that the record amply supports the trial court's conclusion that Wife established, by a preponderance of the evidence, that Husband engaged in a course of conduct that placed Wife in reasonable fear of bodily injury.

¶ 11 Husband argues that Wife should not have been granted a PFA under section 6102(a)(5) because, although he admits engaging in a course of conduct that would harass a reasonable person, Wife did not testify as to a past occasion when he would threaten her like he did on the night of October 7, 2007. We cannot agree that such specific testimony was required to support the entry of the PFA, when considering the totality of Wife's testimony.

Considered as a whole, Wife's testimony of Husband's indirect threats on the night of October 7, 2007, when coupled with her testimony that on prior occasions he would cock his guns within her earshot, established "abuse" under section 6102(a)(5) by a preponderance of the evidence. *See, e.g., Burke ex rel. Burke v. Bauman,* 814 A.2d 206, 207–09 (Pa.Super.2002) (holding threats over the phone are sufficient to establish "abuse", given defendant's past misconduct toward PFA petitioner); *see also Raker,* 847 A.2d at 725 (explaining that defendant's actual intent with regard to his or her actions toward PFA petitioner is "of no moment"; proper inquiry is whether the circumstances placed the victim in reasonable fear).

 ¶ 12 In his final claim on appeal, Husband asserts that the trial court should have permitted him to question Wife with respect to her motive in filing the PFA petition. According to Husband, "Had the line of questioning been allowed, Husband could have established that Wife's sole motive for filing the [PFA] petition was to gain exclusive possession of the marital residence to gain leverage during the Divorce and ensuing Custody actions." Husband's Brief at 21. Husband argues that the trial court's refusal to permit him to explore Mother's motive for filing the PFA petition constitutes reversible error. Husband is not entitled to relief on this claim.

¶ 13 The disputed exchange referred to by Husband occurred as follows:

BY [HUSBAND'S COUNSEL]:

Q If [Husband] agreed to leave the house until the divorce was finished, would you withdraw this petition?

[WIFE'S COUNSEL]: Objection.

THE COURT: Sustained.

[HUSBAND'S COUNSEL]: I have no further questions, Your Honor.

N.T., 10/19/07, at 24. In its Rule 1925(a) opinion, the trial court concluded that Husband "failed to preserve this issue on the record." Trial Court Opinion, 1/11/08, at 11. We agree. Although the trial court sustained Wife's objection to this particular question, Husband did not inform the court that he wished to challenge Wife's motive for filing the PFA petition. Because he did not alert the trial court as to the reason for his inquiry, he cannot now claim on appeal that the court's refusal to do so results in reversible error. *See* Pa. R.A.P. 302(a) (providing issues cannot be raised for the first time on appeal).

¶ 14 Order affirmed.