J-S72014-14

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| JILL MCINTYRE, | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| TONY RAY MCINTYRE, | |
| Appellant | No. 517 WDA 2014 |

Appeal from the Order Entered March 21, 2014,
in the Court of Common Pleas of Erie County,
Civil Division, at No(s): 17033-14

BEFORE:  BENDER, P.J.E., SHOGAN, and STRASSBURGER*, JJ.

CONCURRING MEMORANDUM BY STRASSBURGER, J.: **FILED JANUARY 05, 2015**

I agree with the Majority that the final PFA order should be affirmed.  I write separately to note my disagreement that Appellee's testimony about the opossum text in any way supports the finding that she was **reasonably** in fear of bodily injury.

Appellee testified that after she moved out of the house, Appellant sent her text messages, some indicating his love for her, some apologizing for his behavior, and some threatening.  N.T., 3/31/2114, at 6.  Appellee's testimony about the threatening texts is as follows.

> Q.    Is it fair to say that the texts you thought were frightening were in regards to this opossum incident?
>
> A.    Yes.

---

* Retired Senior Judge specially assigned to the Superior Court.

Q.     Let's talk about [that] string of texts.  Those occurred on March 1st, correct?

A.     The opossum texts occurred on -- I'm sorry, he has texted me so many -- yes, March 1st.

Q.     Okay.  And he indicated in a text that there was an opossum on the back porch acting strangely?

A.     Hm-mm.

Q.     Is that correct?  Yes?

       THE COURT: Yes?

       [A.]   Yes.

Q.     And then he texted you that he took care of it?

A.     Correct.

Q.     Okay.  And then he texted you that you needed to talk?

A.     He said -- says, quote, I really want to talk to you.

Q.     Okay.  What did you find threatening about that?

A.     Him taking care of the possum, which would mean killing it, because he has guns.  And that's what I believe -- what else -- how -- there's no other way he would kill animals.  He's mentioned before about, you know, taking care of animals or killing, you know, rodents or whatever.

Q.     So you interpret that text to mean he shot and killed the opossum?

A.     Hm-mm.

Q.     That text, he never mentioned a gun?

A.     No.

Q.     Never mentioned shooting it?

A.    Nope.

Q.    Okay.  He wasn't in the habit of shooting animals on your back porch, was he?

A.    He usually doesn't tell me those things.  He is, again, controlling and he doesn't communicate with me.  So I don't know what he does when I'm not present.

Q.    Have you ever heard of him shooting animals on your property or using the gun on your property?

A.    Have I heard of it?

Q.    Yes.

A.    No.

*Id.* at 18-20.

Appellee's conclusion that Appellant's "taking care of" an animal that had been acting strangely on the back porch was code for "I am going to shoot you," without any logical explanation of how she reached that conclusion, is unreasonable. *Cf. Mescanti v. Mescanti*, 956 A.2d 1017, 1023 (Pa. Super. 2008) (holding evidence was sufficient to establish that Husband placed Wife in reasonable fear of bodily injury where Husband after past arguments had gone "to the basement and cock[ed] his guns in such a manner as to ensure Wife heard the noise[,]" and, after the argument in question told her "[Y]ou better not go to sleep. You better not even close your eyes.").

Because the other evidence discussed by the trial court and the Majority was sufficient to establish that Appellee had a reasonable fear of

being injured by Appellant, I agree with the Majority's disposition of this appeal.