J-A27014-15

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| J.L.M., | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellee | |
| v. | |
| J.P.M., | |
| Appellant | No. 1803 WDA 2014 |

Appeal from the Order Dated October 7, 2014
In the Court of Common Pleas of Allegheny County
Family Court at No(s): FD13-002076-004

BEFORE: BOWES, OLSON, AND STABILE, JJ.

MEMORANDUM BY BOWES, J.: **FILED DECEMBER 22, 2015**

Appellant J.P.M. ("Father") appeals from the October 7, 2014 three-year protection from abuse ("PFA") order entered pursuant to the Protection From Abuse Act, 23 Pa.C.S. §§ 6101-6122, that afforded protection to Appellee J.L.M. ("Mother"), the parties' minor son ("M.M."), and Mother's minor daughter from a prior relationship ("A.K."). After careful review, we affirm.

Father and Mother married on June 11, 2011, and had one child, M.M., who was born in October 2012. Mother maintained a separate custody arrangement with A.K.'s natural father, but Father and A.K. enjoyed such a close relationship that Father anticipated adopting her. Though Father began separation proceedings in November 2013, he and Mother were married and cohabitating at the time of the PFA hearing on October 7, 2014.

At that time, the couple resided with then-three-year-old M.M. and eight-year-old A.K.  The couple has since formally separated, and the record indicates that they have initiated divorce.

The final PFA order that gave rise to this appeal followed the termination of a consent agreement between Mother and Father that disposed of a December 3, 2013 temporary PFA.  Mother initially petitioned the PFA court following several instances of threats and abuse by Father.  The court, which has presided over all proceedings relevant herein, found that, in episodes preceding the instant PFA, Father: 1) told Mother that he was going to kill her; 2) smashed glass over his head and shattered a copy of the parties' wedding vows gifted to him by Mother; 3) told M.M. how much he hated Mother; 4) stomped on Mother's foot to move her away from M.M.; 5) threw a soiled diaper at Mother; 5) threw M.M.'s booster seat at Mother's car and smashed her cell phone to prevent her from calling for help; 6) punched out the windshield of a vehicle in a drunken rage; and 7) forcibly pulled M.M. from Mother before ripping the baby monitor off of the wall and locking himself and M.M. in a room.  Trial Court Opinion, 1/5/15, at 6.  The first temporary order issued by the PFA court restricted Father's contact with Mother, M.M., and A.K.

That order was vacated on December 18, 2013, by a consent agreement, which addressed only contact between Mother and Father.  The agreement gave Mother exclusive possession of the marital home, prohibited

contact between Mother and Father except "by text or email with regard to their son," and required Father to participate in drug and alcohol and anger management evaluations. Consent Agreement, 12/18/13, at 1-2. The consent agreement imposed no restrictions on communication or interaction among Father and the children. Importantly, Mother was permitted to re-petition the court for a new PFA action if Father violated the consent agreement by "contact, harassment, abuse, threats, stalking, and trespass[.]" *Id*.

In the months following that agreement, Father engaged in conduct that the PFA court would ultimately deem to be stalking and harassment. That conduct was described as follows by the court:

> Father hired a firm, Empire Investigations, to conduct surveillance of Mother. Father paid the firm between $8,000 to $9,000 to follow Mother over the course of 35 to 45 days in the summer of 2014. Empire Investigations followed Mother by, among other things, a global positioning system or "GPS." Father testified that he paid and authorized Empire Investigations to follow Mother, but suggested that he did so under the guise that he hired them to follow the car which Mother drives — an automobile that is in Father's name. The investigators created reports and sent them to Father. Such reports detailed the amount of time per day that the investigators followed Mother. On some days, they tracked her all day. The reports, by indicating where and when Mother was at certain times, also made it clear that Mother had a routine. The investigators employed a "geo-fence," which is apparently a device that alerts the agents that Mother is on the move, as indicated by the GPS. They also used night vision. The agents took photos of Mother, her mother and her daughter from a previous relationship. Eventually Mother discovered the GPS and discovered that Father had been following her.

Trial Court Opinion, 1/5/15, at 3 (citations to testimony omitted).

Mother was unaware of Father's surveillance until an August 2, 2014 custody exchange. N.T., 9/25/14, at 28-29. Though Mother and Father regularly arranged for their parents to execute custody exchanges, Father requested that the two meet so he could introduce his girlfriend to M.M. in Mother's presence. *Id*. As Mother, M.M., and Mother's mother approached Father and his girlfriend in the parking lot, M.M. saw Father and called out Father's name as well as the name of Father's girlfriend. *Id*. at 29. Doubting Father's pretext about an initial introduction between M.M. and his girlfriend, Mother pointedly asked Father's girlfriend if this encounter was the first time she had met M.M., and Father's girlfriend, following a pause and "quizzical" look to Father, answered "no." *Id*. at 29-30. As Mother returned to her vehicle, Father asked Mother about A.K. and noted that he was aware that she had been spending time in Youngstown, Ohio. *Id*. It was after this exchange that Mother became suspicious of Father's knowledge of her whereabouts and ultimately discovered his surveillance.

In response to her August 2, 2014 interaction with Father, Mother filed a petition to prevent stalking and harassment. The court denied that motion but preserved Mother's right to re-present her concerns as a PFA. Mother did so, and on August 19, 2014, the court granted a second temporary PFA order in favor of Mother and both minor children. The parties held a final

hearing on the matter on September 25, 2014, and October 7, 2014 ("final PFA hearing").

At that hearing, Mother testified extensively about the August 2, 2014 exchange, as well as additional interactions between her and Father during the period in which he surveilled her. Among them are the following incidents:

[1.] In another instance, [Father] emailed Mother about a haircut for the child. Mother said that she could not physically get the child to the barber in time. Father pointedly told her that she **could** make it because she was in South Fayette; thereby indicating that he knew where she was.

[2.] [O]ne day when Mother dropped [A.K.] off at gymnastics camp, she saw Father parked **nearby** staring and laughing at Mother, trying to get attention. There was no reason for Father to be in that area at all, let alone in the middle of the day. Mother later learned that her route to the gymnastics camp was documented in a report by the investigators and given to Father.

Trial Court Opinion, 1/5/15, at 5 (citations omitted) (emphases supplied). In general, the PFA court found it "clear that Father, in hiring the investigators, used the information they provided so he could more efficiently stalk and harass Mother, placing her in fear of bodily injury." *Id*. It also acknowledged that Mother "testified credibly" that the tone of the August 2, 2014 interactions was meant to "incite [Mother] or create some sort of anger" and that Father would not have known of her whereabouts but for his monitoring of her activity. *Id*. at 3. In contrast, the court found

incredible Father's testimony that the surveillance was necessary "in all efforts for [M.M.]" and to delve into Mother's alleged and otherwise unfounded drug and alcohol intake. *Id*.

Accordingly, the trial court, following that contested hearing, entered a three-year PFA order in favor of Mother, M.M., and A.K. The order does not contain custody directives, as the trial court separately invited proposed orders from the parties before ultimately issuing its custody ruling on November 18, 2014. That order is not at issue in this appeal.

Father appeals the October 7, 2014 PFA order entered against him with respect to Mother and M.M., but not A.K. He complied with the PFA court's directive to file a Pa.R.A.P. 1925(b) concise statement of errors complained of on appeal, and soon after, the trial court filed its responsive Pa.R.A.P. 1925(a) opinion. This matter is now ready for our review.

On appeal, Father presents two matters:

A. Whether the Trial Court erred as a matter of law and abused its discretion in entering a three-year Protection From Abuse Order on behalf of Appellee.

B. Whether the Trial Court erred as a matter of law and abused its discretion in entering a three-year Protection From Abuse Order on behalf of the parties' minor child, [M.M.], as a protected party.

Appellant's brief at 6.

With respect to the final order as it relates to Mother, Father argues that the PFA court erred in finding that Mother proved "abuse" within the

meaning of the PFA statute following the revocation of the consent agreement. Further, he argues that, since retention of Empire Investigations to track Mother's whereabouts and report them to him is authorized by the Private Detective Act of 1953, 22 P.S. § 11, *et seq*, it could not be labeled "stalking" within the meaning of the Crimes Code.[1] Similarly, he notes that the trial court did not make a specific finding that Father's conduct constituted any of the seven statutory types of criminal harassment.[2] Even if his conduct qualified as either of the two offenses,

_____

[1] **Offense defined.**--A person commits the crime of stalking when the person either:

> (1) engages in a course of conduct or repeatedly commits acts toward another person, including following the person without proper authority, under circumstances which demonstrate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person; or

> (2) engages in a course of conduct or repeatedly communicates to another person under circumstances which demonstrate or communicate either an intent to place such other person in reasonable fear of bodily injury or to cause substantial emotional distress to such other person.

18 Pa.C.S. § 2709.1(a).

[2] **Offense defined.**--A person commits the crime of harassment when, with intent to harass, annoy or alarm another, the person:

> (1) strikes, shoves, kicks or otherwise subjects the other person to physical contact, or attempts or threatens to do the same;

*(Footnote Continued Next Page)*

Father continues, since the consent agreement did not "include a provision addressing 'following' or 'stalking and harassment,'" the PFA court improperly found that his conduct, even if stalking and harassment, violated the terms of the consent agreement. Appellant's brief at 21.

With respect to the final order as it relates to M.M., Father avers that the PFA court improperly considered events occurring at exchanges at which Mother was not present and could not offer evidence that Father abused M.M. Specifically, he argues that the testimony presented by Mother about Father's conduct at these exchanges does not support a finding of abuse, as general hostility and social discomfort are not considered by the PFA statute. Father also points to the PFA court's October 10, 2014 custody decision that

*(Footnote Continued)* ───────

(2)  follows the other person in or about a public place or places;

(3)  engages in a course of conduct or repeatedly commits acts which serve no legitimate purpose;

(4)  communicates to or about such other person any lewd, lascivious, threatening or obscene words, language, drawings or caricatures;

(5)  communicates repeatedly in an anonymous manner;

(6)  communicates repeatedly at extremely inconvenient hours; or

(7)  communicates repeatedly in a manner other than specified in paragraphs (4), (5) and (6).

18 Pa.C.S. § 2709(a).

operated as a modification to the PFA order that granted Father unsupervised partial custody of M.M.[3] Father argues that the modification is inconsistent with the PFA court's finding that he abused M.M. just three days prior.

Mother argues in response that the PFA court did not abuse its discretion in entering a three-year PFA order in favor of Mother and her two minor children, asserting that Mother's fear of Father is the product of "a domestic environment of violence and abuse consistently perpetrated against her and her family by Father over the past year" and that the PFA court was correct to consider that history. Appellee's brief at 8. With respect to her own protection, Mother, asserting that Father's conduct need not to rise to the level of criminal culpability in order to constitute stalking and harassment, distinguishes between surveillance and the encounters that followed it. She clarifies that it was not simply that Father had her followed by Empire Investigations that put her in fear; instead, it was the menacing manner in which he used that information. Appellee's brief at 22. Since the PFA court was clear that Mother's testimony about the parties' interactions and her responsive fear was as credible as Father's contrary testimony was

---

[3] We observe that the November 18, 2014 final custody order addresses Father's rights to and custody of M.M. while maintaining that "the PFA remains in full force and effect until October 7, 2017 subject to Father's appellate rights[.]" Final custody order, 11/18/14, at 1. The instant PFA, therefore, is not mooted by the PFA court's negation of its prior ruling.

incredible, Mother argues that this Court is bound by that determination and should not disturb the ruling.

With respect to M.M., Mother avers that the PFA court properly considered Father's history of abuse and use of her children against her. The PFA court only needed to be given "some evidence from which the trial court can determine reasonable fear." Appellee's brief at 34. As "[a]mple evidence existed from which the Trial Court, if it believed Mother, could conclude that Father's actions placed [M.M.] in imminent fear of injury," it did not abuse its discretion in including M.M. in the final PFA order as a protected party. Appellee's brief at 34. Mother also criticizes Father's alleged conflation of custody and PFA issues, arguing that the PFA court, in addressing different matters with different standards, was permitted to enter the PFA with respect to M.M. and concomitantly grant Father partial custody.

We agree with Mother on both issues and find that the PFA court did not abuse its discretion in entering a final PFA order on behalf of both Mother and M.M.

Our standard of review for PFA orders is well settled. A plaintiff must prove the allegation of abuse by a preponderance of the evidence, 23 Pa.C.S. § 6107(a), and "[i]n the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion." *Boykai v. Young*, 83 A.3d 1043, 1045 (Pa.Super. 2014) (citation omitted). In that evaluation, we remember that the trial court's discretion must be "exercised

on the foundation of reason, as opposed to prejudice, personal motivations, caprice or arbitrary actions." **Mescanti v. Mescanti**, 956 A.2d 1017, 1019 (Pa.Super. 2008). As Father's claims both sound in sufficiency, we further recognize the following:

> When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inference, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it. Furthermore, the preponderance of evidence standard is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence.

**Thompson v. Thompson**, 963 A.2d 474, 477 (Pa.Super. 2008) (internal citations omitted). Furthermore, "[c]redibility of the witnesses and the weight accorded their testimony is within the exclusive province of the judge as fact finder." **Karch v. Karch**, 885 A.2d 535, 537 (Pa.Super. 2005).

This Court has recognized that "the primary goal of the [PFA Act] is not retrospective punishment but 'advance prevention of physical and sexual abuse.'" **Snyder v. Snyder**, 629 A.2d 977, 981 (Pa.Super. 1993) (citation omitted). Abuse as defined by the PFA Act includes: (1) intentionally, knowingly, or recklessly causing bodily injury; (2) placing another in reasonable fear of imminent serious bodily injury; (3) the infliction of false imprisonment; (4) physically or sexually abusing minor children; and (5) knowingly engaging in a course of conduct or repeatedly committing acts

- 11 -

toward another person including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. **See** 23 Pa.C.S. § 6102(a)(1)-(5). As it relates to Mother, the PFA court herein found abuse as defined by § 6102(a)(2), placing another person in reasonable fear of imminent serious bodily injury.

We first clarify that the genesis of the order in question was Mother's second PFA petition. PFA Petition and Temporary Order, 8/22/14. That petition served as the subject of the final PFA hearing that resulted in the entry of a final three-year PFA in favor of Mother and her minor children. Father's violation of the consent agreement is of little consequence herein. Indeed, the consent agreement expressly permitted Mother to "re-petition the Court for a new PFA Order upon a future showing of sufficient cause." Consent Agreement, 12/18/13, at 1.

We therefore do not need to examine specifically whether Father violated the terms of the consent agreement, as this appeal ultimately stems from Mother's August 22, 2014 PFA petition. Affirming the trial court's finding of abuse herein verifies that the trial court was also presented with "sufficient cause" as referenced in the consent agreement, which permitted Mother to re-petition the PFA court. **Id**. at 1. Thus, this Court need only determine whether the PFA court was presented with sufficient evidence at the final PFA hearing to find, by a preponderance of the evidence, that

Father abused Mother and M.M. and that entry of the October 7, 2014 order was proper.

We also note that this Court has held that "the Protection from Abuse Act requires flexibility in the admission of evidence and that prior instances of abuse are relevant and admissible." *Hood-O'Hara v. Wills*, 873 A.2d 757, 761 (Pa.Super. 2005) (citing *Miller v. Walker*, 665 A.2d 1252 (Pa.Super. 1995)). To limit our review to only the plain words on the face of Mother's second PFA petition is to improperly shackle her to the confines of page and time limitations and affords Father insulation from our thorough review of his lengthy and disturbing history of conduct. The PFA court's consideration of previous instances of abuse, including those that gave rise to Mother's first PFA petition against Father, was therefore not error. As we have previously held, such instances are relevant. Moreover, they fashion a necessary and appropriate historical lens through which we must view the evidence presented at the September 25, 2014 hearing which resulted in the instant final PFA order.

We agree with the PFA court that Father's conduct in using information gathered by Empire Investigations put Mother in reasonable fear of imminent bodily injury. As recognized by the PFA court in the September 25, 2014 hearing, "[t]he fact that [Father] bragged to [Mother] about her whereabouts during the existence of this contract, from my perspective, was specifically designed to put [Mother] in fear. And it was an indirect threat."

- 13 -

N.T., 10/7/15, at 135. Indeed, in PFA matters, it is "the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury. The intent of the alleged abuser is of no moment." **Buchhalter v. Buchhalter**, 959 A.2d 1260, 1263 (Pa.Super. 2008).

We view Mother and Father's testimony in the context of their entire relationship. **See Burke ex rel. Burke v. Bauman**, 814 A.2d 206, 209 (Pa.Super. 2002) (holding, *inter alia*, that verbal threats alone were sufficient for a person to be placed in reasonable fear of imminent bodily injury, "particularly when coupled with the alleged abuser's past history of violence"). Whether Father had authority under the Private Detective Act to observe Mother and her whereabouts is irrelevant, as it was not simply the surveillance of Mother that the PFA court found to be threatening. Instead, it was the **use** of that information that constituted abuse, especially when in light of Father's history of physical violence and inability to provide an appropriate alternative explanation for his conduct. The PFA court had sufficient evidence to enter a three-year PFA order in Mother's favor following a finding of abuse by Father and did not abuse its discretion in doing so.[4] We will not disturb that ruling.

---

[4] We reject Father's argument that his surveillance was not stalking and harassment because it did not rise to the level of criminal culpability. As we explicitly stated in **Miller on Behalf of Walker v. Walker**, 665 A.2d 1252, 1257 (1995), "appellant's argument that his conduct did not rise to the level
*(Footnote Continued Next Page)*

We next examine the propriety of the PFA court's inclusion of M.M. in the three-year PFA order as a protected party. At the September 25, 2014 hearing, the PFA court related the following observations to Father with respect to M.M.'s involvement with the proceeding:

This Court also finds that you with absolute immature disregard for your behavior and the impact on your son, [M.M.] have placed this young child in a situation where he has had to experience the same type of abuse that [Mother] has. As a small child, he has even less ability to handle it, and even less of an ability to deal with the yelling, screaming and throwing and whatever else actually occurred.

N.T., 10/7/15, at 138. Likewise, in its 1925(a) opinion, the trial court aptly noted that Father's animosity "toward mother has put his child at serious risk[.]" Trial Court Opinion, 1/5/15, at 7. The latter is a factual finding to which we must defer.

In addition to incidents addressed *infra*, many of which were witnessed by M.M., Mother discussed the following episode. On March 30, 2013, Father attended a golf outing with his brother. N.T., 10/7/14, at 17. After drinking alcohol all day, Mother asked Father's brother to "please not bring him home while [Mother] was there with the kids by [herself]" if Father was intoxicated. ***Id***. Mother ultimately had to pick up Father's brother, and when she arrived at his location, she saw Father's company car, which had a

*(Footnote Continued)* ──────────

of criminal culpability does not defeat the trial court's protection from abuse order."

- 15 -

smashed windshield, broken glass inside, and considerable amounts of blood on the inside and outside. *Id*. at 19-20. Father, who was heavily intoxicated with bloody hands and feet, was home when Mother returned. *Id*. A.K., who "was crying from the blood on his hands," and M.M. were inside the house. *Id*. Mother asked her parents, who had come over to watch the children, to take her children upstairs before they left. *Id*. at 21. Later, when Mother was in the bedroom with M.M., an intoxicated Father, who had continued to drink alcohol after returning to the home, entered, approached Mother, called her a "f___ bitch and a c___," and continued to yell at Mother in M.M.'s presence. *Id*. at 22.

Mother then called her parents to return to the house, which they did. They attempted to help Mother remove A.K. and M.M. from the home, but Father interfered: "[M.M.] was in the car seat. He was crying. I was crying. I was trying to leave. [Father] was yanking the car seat. And I said, please stop." *Id*. at 23. Mother, fearing for M.M.'s safety, put the car seat down, and Father took M.M. from the car seat. *Id*. Mother's father called the police, who encountered a drunk and belligerent Father, but ultimately took no substantial action. *Id*. at 24. When the police left the home, Father took M.M., locked them both in a bedroom, and ripped the baby monitor off the wall. *Id*. at 25. The next day, Mother asked Father to leave the family home in fear for her safety and the safety of her children. *Id*. at 25.

Mother recounted several other instances involving M.M. Among them was the following. When Mother attempted to leave the home during an argument, Father, with M.M. and A.K., followed Mother into the garage and held the car door open so she could not leave. N.T., 9/25/14, at 35. A.K. entered the back seat of Mother's car, but Mother could not take M.M. "because the more she tried to take [M.M.], the angrier that [Father] gets[.]" *Id*. With M.M. in his vehicle, Father then followed Mother, speeding through red lights in order to keep up with her. *Id*. at 36.

The PFA court found that Father had placed M.M. in situations where Father's animosity towards Mother forced him to endure similar abuse at the hands of Father. This Court has held that "the party seeking a PFA order must come forward with some evidence of either an injury or reasonable fear of imminent injury." *Ferri v. Ferri*, 854 A.2d 600, 604 (Pa.Super. 2004). Accepting Mother's testimony about these incidents as true, which we must do, we recognize that Mother has come forward with ample evidence of M.M.'s reasonable fear of imminent injury. Accordingly, the PFA court properly entered a three-year PFA against Father with respect to M.M. following a finding of abuse by a preponderance of the evidence.

We decline to address Father's argument that the PFA court's finding of abuse is inconsistent with its eventual custody order granting limited unsupervised custody to Father, as he insufficiently develops the argument such that we cannot meaningfully evaluate whether the PFA court abused its

discretion in doing so. Specifically, we note that this discussion, which spans just three sentences, includes no compelling argument regarding why an apparent inconsistency necessitates a finding in his favor. The record was devoid of testimony or evidence that Father abused M.M. when Mother was not present or otherwise implicated. The PFA court's provision of unsupervised visitation to Father, especially when coupled with restrictions on Father's interactions with Mother, is consistent with a finding that Father is primarily a threat to M.M. when M.M. is caught between the two. We also observe that Father cites to no authority for his contention that an apparent inconsistency between a custody determination and a PFA impacts the validity of either. *See Commonwealth v. Delvalle*, 74 A.3d 1081, 1086 (Pa.Super. 2013) (finding that "[f]ailure by the appellant to discuss pertinent facts or cite legal authority will result in waiver" of an argument as undeveloped).

We therefore find that PFA court was presented with sufficient evidence to warrant a finding that Father abused Mother and M.M. for the purposes of the PFA Act and did not err in entering a three-year PFA relative to both.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


DATE:  12/22/2015