J-A12033-21

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| FELICIA LEONARD, | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| Appellant | : | |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| DUKE KERSHNER (HARRINGTON | : | No. 1192 MDA 2020 |
| KERSHNER, IV) | | |

Appeal from the Order Entered August 13, 2020
In the Court of Common Pleas of Lycoming County Civil Division at
No(s): FC-2020-0020350-AB

BEFORE: LAZARUS, J., STABILE, J., and MUSMANNO, J.

MEMORANDUM BY MUSMANNO, J.: **FILED JULY 13, 2021**

Felicia Leonard ("Mother") appeals from the Order denying entry of a final Protection From Abuse Act ("PFA")[1] order against Duke Kershner (also known as Harrington Kershner, IV)[2] ("Kershner"), the uncle of Mother's daughters, B. (age 14), and L. (age 11) (collectively, "Children").[3] We affirm.

In February 2020, Father was homeless. Kershner, who is married to Father's sister, allowed Father to move into Kershner's house. Father lived

---

[1] **See** 23 Pa.C.S.A. §§ 6101-6122.

[2] At the August 12, 2020, PFA hearing, Kershner asked that his name be corrected on the record to Harrington Kershner, IV. N.T., 8/12/20, at 4. The trial court agreed to the correction. **See id.**

[3] Mother and J.C. ("Father"), who are not married, are the parents of Children, and two other daughters, A. and R. Mother and Father share custody pursuant to an informal custody arrangement. Kershner is married to Father's sister.

with Kershner and Kershner's wife, Jennifer ("Jennifer" or "Jen"), from February 2020 until May 22, 2020. When Children visited Father, they stayed in the basement game room of Kershner's house.

On June 5, 2020, Mother initiated the instant proceedings against Kershner by filing a Petition pursuant to the PFA. That same day, the PFA court entered a temporary PFA Order. After several continuances, the matter proceeded to a hearing on August 12, 2020. By an Order entered on August 13, 2020, the PFA court denied entry of a final PFA order. Mother filed a timely Notice of Appeal, followed by a court-ordered Pa.R.A.P. 1925(b) Concise Statement of matters complained of on appeal.

Mother presents the following claims for our review:

1. Whether the trial court abused its discretion and/or committed errors of law by misapplying the preponderance of the evidence standard by concluding there was insufficient evidence for a PFA to protect and keep safe [Children] from [Kershner,] where [Children and Youth Services ("CYS")] indicated both reports of abuse, [Kershner] was the perpetrator, and the undisputed direct evidence, circumstantial evidence and reasonable inferences of the undisputed facts met the preponderance of the evidence standard?

2. Whether the trial court committed a harmful and unduly prejudicial error of law or abuse of discretion by admitting and considering an extremely prejudicial, irrelevant and incomplete video that was proffered only for the irrelevant purpose of claiming that [one of the Children was] not fearful, when fear is not required for sexual abuse or sexual grooming?

Brief for Appellant at 4.

- 2 -

Mother first claims that the undisputed evidence was sufficient to enter a final PFA order, where the abuse was "indicated"[4] by CYS, and where the preponderance of the evidence standard was met. *Id.* at 23. According to Mother, it was "undisputed that CYS found the case was indicated for [Children] with [Kershner] as the perpetrator, which means that it is a substantiated case of child abuse." *Id.* at 25. Mother asserts that the substantial evidence standard that applies to a CYS finding is "far greater" than the preponderance of the evidence standard required for a PFA. *Id.* According to Mother, the trial court improperly afforded minimal to no weight to the CYS finding. *Id.* at 26. Mother further asserts that Kershner "made a tacit admission upon being called a pedophile." *Id.*

Mother states that once, when B. informed Kershner that she was showering, Kershner responded, "prove it." *Id.* at 27. According to Mother, "the reasonable inference is that [Kershner] sought a picture of [B.] having just gotten out of the shower." *Id.* Mother further argues that the trial court applied the wrong standard, and that the definition of "abuse" includes "attempting to cause sexual assault and includes 'creating a likelihood of

---

[4] An "indicated" report is defined, in pertinent part, as "a report of child abuse made pursuant to this chapter if an investigation by … [CYF] determines that substantial evidence of the alleged abuse by a perpetrator exists based on … [t]he child protective service investigation." 23 Pa.C.S.A. § 6303. However, for an "indicated" report to attain the status of a "founded report," there must be a judicial adjudication. *Id.*

sexual abuse or exploitation of a child through any recent act or failure to act.'" *Id.* at 27-28 (quoting 23 Pa.C.S.A. § 6303) (emphasis omitted). Mother directs our attention to the trial court's statement that Kershner had "placed himself in a position to have accusations made at him[.]" *Id.* at 28. Mother asserts that the trial court improperly focused on the *mens rea* culpability of Kershner, rather than on whether Kershner's actions warranted protection for Children. *Id.*

We review the propriety of a PFA order for an error of law or an abuse of discretion. *Commonwealth v. Walsh*, 2012 PA Super 9, 36 A.3d 613, 617 (Pa. Super. 2012).

In reviewing a challenge to the sufficiency of the evidence supporting the PFA order, this Court must view the evidence in the light most favorable to the verdict winner, giving the prevailing party the benefit of all reasonable inferences. *S.W. v. S.F.*, 196 A.3d 224, 230 (Pa. Super. 2018). "Assessing the credibility of witnesses and the weight to be accorded to their testimony is within the exclusive province of the trial court as the fact finder." *Id.* "In reviewing the validity of a PFA order, this Court must ... defer to the [trial] court's determination of the credibility of witnesses at the hearing." *C.H.L. v. W.D.L.*, 214 A.3d 1272, 1276-77 (Pa. Super. 2019).

The PFA Act defines "abuse" as

[t]he occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:

- 4 -

**(1)** Attempting to cause or intentionally, knowingly or recklessly causing bodily injury, serious bodily injury, rape, involuntary deviate sexual intercourse, sexual assault, statutory sexual assault, aggravated indecent assault, indecent assault or incest with or without a deadly weapon.

….

**(4)** Physically or sexually abusing minor children, including such terms as defined in Chapter 63 (relating to child protective services).

**(5)** Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S.A. § 6102.

This Court has explained that

"[t]he PFA Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence." ***Snyder v. Snyder***, 629 A.2d 977, 982 ([Pa.] 1993). A "preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, to tip a scale slightly is the criteria or requirement for preponderance of the evidence." ***Raker v. Raker***, 847 A.2d 720, 724 (Pa. Super. 2004).

….

In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of bodily injury. ***See Raker, supra***. "The intent of the alleged abuser is of no moment." ***Buchhalter*** [***v. Buchhalter***], 959 A.2d [1260,] 1263 [(Pa. Super. 2008)]. Moreover, this Court has held that past acts are significant in determining the reasonableness of a PFA petitioner's fear. ***Id.*** at 1264. As the goal of the Act is to prevent physical and sexual abuse, a victim does not have to wait for physical or sexual abuse to occur for the Act to apply. ***Id.***

***K.B. v. Tinsley***, 208 A.3d 123, 128 (Pa. Super. 2019).

At the PFA hearing, Mother testified that, in February 2020, B. had received a text message from Kershner.  N.T., 8/12/20, at 28.  As a result of the text message, Mother told Father that she did not want Children in the Kershner house.  ***Id.*** at 27.

On May 22, 2020, Mother received a text message from her daughter,[5] which caused Mother to contact Father.  ***Id.*** at 30.  According to Mother, while talking to Father on the phone, "[i]n the background, I could hear my daughter screaming at me, mom, she hit me in my mouth, come get me, referring to [Jennifer]."  ***Id.*** at 30.  Mother testified that Father refused to allow his daughter to come to the phone.  ***Id.***  In addition, Mother testified, Father refused to allow her to video chat with Children and thereafter turned off his phone.  ***Id.***  Although Children were to return to Mother on that Sunday, she immediately went to Kershner's house to see Children.  ***Id.*** at 31.

Mother also testified that when Mother called Kershner a pedophile, he smiled in response, not denying the allegation.  ***Id.***

Mother described Children as "maturely challenged[,]" and stated that B. is "incredibly rebellious."  ***Id.*** at 31.  Mother testified that

> on numerous occasions, I have taken him, [] Kershner, off of my daughter's Instagram.  And then she would come home from the weekend with [Father], and he would be back on her Instagram.

---

[5] In her testimony, Mother appears to refer to B.

At one point in time, I had went to factory reset my daughter's phone, and [] Kershner's e-mail was actually the back-up e-mail for my daughter's phone. So I wasn't able to even back-up any of my daughter's pictures or nothing.

… I can't trust that my daughter would not, you know, redownload Instagram. And, of course, I can—I can control my daughter to an extent; but I definitely cannot control [] Kershner's actions [].

*Id.* at 32. Mother could not obtain her daughter's Instagram messages, after deletion, without involving police. *Id.*

Mother also testified that her daughter's Snapchat messages could not be traced. *Id.* at 33. According to Mother, she sought a PFA order "for as long as it can possibly be[,] considering [Children] are of the ages of 14 and 11. So even after the PFA is done and over, [Children] will still be minors. And, as I said, [Children] are … mentally challenged." *Id.* Mother further explained that Children have Individualized Education Programs. *Id.*

Elizabeth Spagnuolo ("Spagnuolo"), an assessment caseworker for CYS, testified that CYS had received a report of suspected abuse as to Children. *Id.* at 20. According to Spagnuolo, "[t]hat's essentially when you're given some information[,] but no true allegations of abuse." *Id.* On June 5, 2020, Spagnuolo received the report and conducted a "dual" investigation with the Pennsylvania State Police. *Id.* Spagnuolo conducted home visits on June 5, 2020, and June 8, 2020. *Id.* Spagnuolo also interviewed Children and Kershner. *Id.* at 20-21. CYS subsequently found that the allegation of abuse

was "indicated." *Id.* at 21. Spagnuolo stated CYS's position that Children are at risk of abuse with Kershner. *Id.* at 22.

On cross-examination, Spagnuolo testified that, at the beginning of her investigation, she became aware of an incident between Mother and Jennifer. *Id.* According to Spagnuolo, Mother engaged in a physical confrontation with Jennifer at the Kershner house. *Id.* As a result of that confrontation, Spagnuolo testified, Mother was criminally charged, possibly with harassment. *Id.* at 23. According to Spagnuolo, the confrontation was about a haircut given to one of Children at the Kershner house. *Id.* Spagnuolo stated that, according to Mother, Children were not supposed to be at the Kershner house. *Id.*

Kershner explained in his testimony that B. had asked him to fix her cell phone, because she could not remember her password. *Id.* at 34. At that time, Kershner offered to use his email as a backup for her phone. *Id.* Although Mother did not want B. to contact Kershner, she did not comply, and contacted Kershner. *Id.* at 35. Kershner responded to these contacts. *Id.* Kershner explained one incident as follows:

> [B.] said that she just finished her shower. And I stated to her laughing out loud, prove it. And she was like how. And I'm like I don't know. And in the back of my mind I'm joking, just have your sisters tell me you took a shower. Nothing—nothing inappropriate.

*Id.* Later, Kershner detailed the reason for his communication as follows:

> It's been known that [B.] doesn't like to take showers. It's been known to her grandmother. It's been known to [Father]. It's been known to [Jennifer]. She refuses to take showers.
>
> ….
>
> [B.] would be told to go take a shower because she smelled. And the—she would go in. And you could hear the water run and—but it just didn't sound—it just sounded like water running, like no one underneath the shower, like you would hear water splashing. So one of them would get up—I would never go in there; it's not my place to be—and they would check on her.

*Id.* at 66. Kershner denied ever receiving a photo of B. in a state of undress or requesting such a photo. *Id.* at 67.

> Kershner described an incident involving tickling as follows:
>
> [Jennifer] or [Father] would be there. And B. would just—[B.] would always come up, rub her finger up my back just to get me— tickle. And she would be like, Aunt Jen, can I tickle Uncle Duke[?] And then Jen would be like not tonight, he's not in the mood, or [Jennifer] would join in most of the time. And everybody would just be tickling everybody.
>
> ….
>
> There was [*sic*] times where we would be on the futon. Everybody would be around. And then sometimes I would be in my bedroom. They would come in, and we would start tickling there. But the door was always open. And [Jennifer] or [Father] would come in and check on them and see if they were okay.

*Id.* at 36. Kershner confirmed that he was never in the room alone with Children for a long period of time. *Id.*

Kershner testified that he and Jennifer are diabetic, and they keep snacks in their room for themselves. *Id.* Kershner produced his blood sugar

meter in court. *Id.* at 56. Kershner stated that the Children's snacks were kept in the game room. *Id.* at 37.

Kershner testified that he and Children sometimes watched television in his bedroom, with all of them lying on the bed. *Id.* at 37. Kershner denied that Children ever laid on top of him. *Id.* Kershner also explained that he never intentionally kissed Children on the lips:

> Whenever I would get home from work[,] they would come up, kiss me on the cheek. They'd come up, give me a hug, kiss me on the cheek. If there was an incidental one, it would be accidental[,] where I would be on the computer, I would turn, and then B. would catch me, partial lips. I would just wave it off, not think anything of it.

*Id.* at 37-38. Kershner admitted that it happened "[m]aybe a few times." *Id.* at 38.

Kershner described incidents involving B. as follows:

> [W]hen she was at my house[,] she really didn't want to do any chores. She—when it was time for [Father] to take all of the girls over to [Mother's], she didn't want to go. She would fight.
>
> There were times where her and [Father] would get into all-out fights. She would slap her [*sic*]. He would try to pin her down. She would spit on him. And then [Jennifer] would say something, and she would try to intervene. And then [B.] would slap [Jennifer]. And the—but when I went to intervene, it was nothing. It was like I just didn't want to go.

*Id.* at 58-59.

Kershner testified that he communicated with Children through Instagram, but he did not have a Snapchat account. *Id.* at 62. According to

- 10 -

Kershner, B. initiated contact with him. *Id.* at 63. Kershner then became aware that Mother did not want B. contacting him:

> Basically, [Jennifer] was telling me that [B.] said that [Mother] does not want me talking with [Kershner]. And [B.] told me that. Okay. No problem there. But then [B.] would make up different Instagram accounts. At one point I believe there were four different Instagram accounts that [B.] had.

*Id.* Kershner continued to communicate with B. against Mother's wishes. *Id.* at 65.

During the hearing, Kershner testified regarding the altercation that took place on May 22, 2020. *Id.* at 73. Kershner's counsel presented Ring Camera video footage regarding the incident. *Id.* at 74-75. On that date, as Kershner and Jennifer prepared for bed, Mother arrived at the house. *Id.* at 74. Kershner's counsel presented the Ring Camera video as a depiction of B.'s actions and to demonstrate that B. did not fear Kershner. *Id.* at 77. As the video played, Kershner described the video, stating that Mother had struck Jennifer "on the left side of the head[,] right in her temple, eye area." *Id.* at 84. Kershner then tried to break up that altercation. *Id.* When Father attempted to pull Mother away from Jennifer, B. "jumped on top of her dad to pull him off." *Id.* Kershner further described the video as depicting B. kicking Mother. *Id.* at 85. Police officers subsequently broke up the altercation. *Id.* at 87. When B. left Kershner's house, Kershner did not attempt to stop her departure. *Id.* at 85.

During cross-examination, Kershner testified that he was not aware that Father had stopped communication with Mother prior to her arrival at the house, or that Mother was trying to retrieve Children. *Id.* at 90. Kershner further stated that Jennifer was not aware that Mother was there to retrieve Children. *Id.*

Jennifer testified as to catching B. pretending to take a shower by kneeling on the floor and not bathing. *Id.* at 95. Jennifer confirmed that B.'s grooming had become a joke in the family. *Id.* When recalled to the stand, Mother disputed B.'s shower habits. *Id.* at 102.

In its Opinion, the PFA court explained its findings and credibility determinations as follows:

> In this case, the credibility of each witness[,] as determined by the [trial court,] played a large role in the outcome of the case, especially considering the alleged victims did not testify and therefore, no statement made by them [was] admitted into evidence. The [c]ourt agrees that [Kershner] did not contradict most of the evidence presented by [Mother]. However, after the [c]ourt denied [Mother's] oral [M]otion for [a] directed verdict, [Kershner] testified as to the reasons for his actions. For example, there was evidence presented that [Kershner] keeps food in his bedroom[,] such as candy and other sweets. [Kershner] explained that he does so because he and his wife are both diabetic. There was also evidence that [Kershner] kisses the minor [C]hildren on the lips. [Kershner] explained that the [C]hildren will kiss his cheek when they get home and sometimes, although infrequently, he will accidentally turn his head to look at the child and catch the edge of her lip. The [trial c]ourt found that [Kershner] provided reasonable explanations and generally found [Kershner's] testimony credible.

Trial Court Opinion, 10/28/20, at 2 (unnumbered).

- 12 -

Keeping in mind our standard of review, the trial court's findings are supported in the record, and its legal conclusions are sound.[6] ***See id.*** Although Mother places great weight on the "indicated" finding by CYS, the trial court chose not to do so. ***See Mescanti v. Mescanti***, 956 A.2d 1017, 1020 (Pa. Super. 2008) (recognizing that the weight afforded to the evidence is within the exclusive province of trial court, as fact finder). Consequently, there is no basis upon which to grant Mother relief on this claim. ***See id.***

In her second claim, Mother argues that the trial court improperly admitted into evidence an "irrelevant and incomplete video that was proffered only for the irrelevant purpose of claiming that a child was not fearful when fear is not required for sexual abuse or sexual grooming." Brief for Appellant at 31. Mother contends that the issue of whether Children feared Kershner is irrelevant in the type of abuse she alleges, *i.e.*, sexual grooming. ***Id.*** at 32. According to Mother,

> the [c]ourt indicated that the video was relevant because [Mother] opened the door by testifying about picking up the [C]hildren on May 22, 2020[,] and because the altercation between [Mother] and [Jennifer] could provide a motive for [Mother] filing for a PFA to protect [Children] from [Kershner]. Neither of these reasons were proffered by [Kershner] however. The [c]ourt raised them *sua sponte* in the Opinion as reasons to bolster its evidentiary ruling.

***Id.*** n.6.

_____

[6] Significantly, our review of the record discloses that Children did not testify at the hearing, thereby providing an alternative explanation for the events.

In addition, Mother claims that the video was highly prejudicial, as it contained inflammatory content and was not available in its entirety. *Id.* at 33. In particular, Mother points out the omission of a portion of the video in which Kershner smiled in response to being called a pedophile, and where Jennifer had struck Mother. *Id.* at 34. Mother asserts that, had the entire video been available, it would have impugned Kershner's character as well as her own. *Id.* According to Mother, although none of her evidence had been controverted, the trial court concluded that no abuse had occurred, after viewing the video. *Id.* at 35. Mother further argues that, in denying Kershner's Motion for a directed verdict, the trial court emphasized Kershner's tacit admission in response to being called a pedophile and Kershner's text message to B. as evidence of abuse. *Id.*

As this Court has explained, "[q]uestions concerning the admission or exclusion of evidence are within the sound discretion of the trial court and may be reversed on appeal only when a clear abuse of discretion was present." *Buchhalter v. Buchhalter*, 959 A.2d 1260, 1263 (Pa. Super. 2008) (citation omitted). "In light of the protective purposes of the [PFA], it [is] within the trial court's discretion to hear any relevant evidence that would assist it in its obligation to assess the [complainant]'s entitlement to and need for a protection from abuse order." *Id.* (citations omitted). In addition,

> [t]he admission of authenticated videotape evidence "is within the sound discretion of the trial court[.]" *Commonwealth v. McKellick*, 24 A.3d 982, 986 (Pa. Super. 2011). "[T]his Court will find the trial court abused its discretion only where it is

revealed in the record that the court did not apply the law in reaching its judgment or exercised manifestly unreasonable judgment or judgment that is the result of partiality, prejudice, bias, or ill will." *Id.*

*Partlow v. Gray*, 165 A.3d 1013, 1019 (Pa. Super. 2017).

In its Opinion, the trial court recognized that,

[o]n direct examination, [Mother] testified regarding the incident taking place in the video and therefore opened the door to [Kershner]. While the video was not available in its entirety, the [trial c]ourt took that into consideration when weighing the credibility and the relevancy of the video. The [trial c]ourt also allowed the admission of the video to show potential motivation [of Mother], who is the mother of the alleged victims, to file the Petition for [PFA] against [Kershner]. The video clearly shows [Mother] and [Jennifer] involved in a physical altercation….

Trial Court Opinion, 10/28/20, at 4 (unnumbered). The trial court's findings are supported by the evidence of record.

Our review further discloses that Mother suffered no prejudice caused by the admission of this evidence. At the hearing, Mother testified regarding omissions from the video recording. *See* N.T., 8/12/20, at 99-102 (wherein Mother describes asking to see Father numerous times, and stating that, without a physical altercation, she could not have seen Children). We cannot conclude, under the circumstances presented, that the trial court abused its discretion in admitting the video evidence at the hearing. It was for the trial court, as fact finder, to assess the weight of the video evidence, in light of its omissions. *See Mescanti*, 956 A.2d at 1020 (recognizing that the weight to be accorded to evidence is within the exclusive province of the trial court as fact finder). As such, we discern no error or abuse of discretion by the trial

court in admitting the video evidence at the hearing.  ***See id.***  Accordingly,

we affirm the Order of the trial court.

Order affirmed.


Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 07/13/2021