J-A15015-17

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | |
|---|---|
| TERESA L. DUNN, FORMERLY KNOWN AS TERESA L. VARNER | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| Appellant | |
| v. | |
| DONALD L. VARNER | |
| | No. 2113 MDA 2016 |

Appeal from the Order Entered November 28, 2016
In the Court of Common Pleas of Mifflin County
Civil Division at No(s): CP-44-CV-1071-2016

BEFORE:  MOULTON, J., SOLANO, J., and MUSMANNO, J.

MEMORANDUM BY MOULTON, J.:              **FILED OCTOBER 27, 2017**

Teresa L. Dunn, formerly known as Teresa L. Varner ("Wife"), appeals from the November 28, 2016 order entered in the Mifflin County Court of Common Pleas denying her petition under the Protection from Abuse ("PFA") Act, 23 Pa.C.S. §§ 6101-22, against Donald L. Varner ("Husband").  We affirm.

On September 12, 2016, Wife filed a PFA petition against Husband. The trial court held a hearing on November 23, 2016 at which Wife requested that the PFA be in place for two to three years and that Husband relinquish his firearms.  N.T., 11/23/16, at 21.  At the PFA hearing, the trial court heard conflicting testimony from Wife, Husband, and their daughter, Melinda Sutherland ("Daughter").

Wife testified to the following:

- She has been married to Husband for 35 years. *Id.* at 5.

- At the beginning of the marriage, Husband threw Kool-Aid at her, which resulted in a "chemical burn" in her eye. *Id.* at 19.

- At some point between 2008 and 2010, Wife left because Husband was very angry at her. *Id.* at 14. Husband took his "turkey gun" and followed her until she called him and told him that if he did not leave her alone she would call the police. *Id.* at 15.

- Early in 2016, Husband threw canned goods at Wife and hit her ankle. *Id.* Wife told him, "you know, you have very good aim so if you want to hit me, you are going to hit me." *Id.* Husband replied, "I do have very good aim and if I wanted to hit you, I'd hit you on the head where it counts." *Id.* at 14.

- On July 9, 2016, Wife's friend Lori asked her to go out, and Wife told Lori "no." *Id.* at 9. Wife told Husband, "You are going to be proud of me" because "Lori had called me and asked me to go out and I told her no." *Id.* Wife stated that this caused Husband to be furious, and she laid down on the couch to get away from the situation. *Id.* Husband grabbed her by the wrist and "kept squeezing really hard. And he was so close to my face I could feel his spit when he was talking. It was just like venom." *Id.* Wife testified she was kicking his arms but he would not let go. *Id.* When he finally let go, he told her to pack her bags and leave, which Wife did. *Id.* at 9-10. Wife testified that Husband followed

- 2 -

her. She stopped at a restaurant and called 911. *Id.* at 10. She explained to the police what had happened and Husband was charged with harassment,[1] to which he pled guilty. *Id.* at 10-12.

- On July 12, 2016, three days later, Wife returned home. *Id.* at 12. Wife testified that she saw Husband put his Glock pistol in the left side of his belt as they were about to leave the house. *Id.* at 12-13. She stated this caused her to be in fear because he is right-handed and put the pistol on his left side. *Id.* When she asked Husband why he was putting on a pistol, he said, "the world is a bad place out there." *Id.* at 13.

- On August 1, 2016, the parties went on a three-day, pre-planned trip. *Id.* at 12. Wife testified that she again left the marital home on August 3, 2016. *Id.* She moved into Scott Wilson's house in Thompsontown, Pennsylvania. *Id.* at 56-57. Wife informed Husband, however, that she was two and one-half hours away from their residence in McVeytown, Pennsylvania. *Id.* at 34; PFA Pet., 9/12/16.

- On August 21, 2016, Husband texted Wife. N.T., 11/23/16, at 6-7. The text included a picture of her new residence and her car parked in front. *Id.* Wife stated that Daughter told Wife to call her, and

---

[1] 18 Pa.C.S. § 2709(a).

when Wife called, Daughter passed the phone to Husband. *Id.* at 6. Husband asked Wife if she knew Wilson, the owner of the residence where she had been staying, and when Wife said "no," Husband accused her of lying, told her he could see her on the porch, and stated that he was "so close to you I could throw a stone." *Id.* at 6. Wife testified this caused her to be terrified. *Id.* She stated that in an effort to get away she asked Wilson, who was a truck driver and would be away for three weeks, if she could go with him because she did not know what Husband would do. *Id.* at 7-8. When Wife returned three weeks later, she filed a PFA petition against Husband.

- About five years ago, Husband got angry at her for using the computer and threw at her "the ironing board, furniture, anything he could get a hold of." *Id.* at 19.

- Wife testified that Husband would call her and send her text messages every day and that one time she counted 17 calls in one day. *Id.* at 5. Wife stated that Husband would not let her go out with friends and she would feel isolated. *Id.* at 18. Wife further alleged that every time the parties would argue Husband would get his rifle out and, while she was in the same room, would "click the chamber." *Id.* at 16. Wife also testified that Husband owns a gun he calls "the Judge" and that he placed it under the bed with the barrel facing Wife and she was afraid to move in fear that the gun

- 4 -

would go off. *Id.* Wife admitted that she gave Husband a gun for Christmas, but claims this was in 1986 or 1987 and that his behavior with guns did not begin until a year or two after that. *Id.* at 17. Wife also testified, however, that Husband had been abusive during the entire 35-year marriage. *Id.* Finally, Wife testified that Husband's temper escalated throughout the years and now he would get angry every two weeks. *Id.*

On cross-examination, Wife admitted that she called Husband on September 11, 2016, the day before she filed the PFA, and that she went to the marital residence on September 13, 2016, the day after she filed the PFA. *Id.* at 23-24. Upon questioning regarding treatment for mental health issues, Wife admitted that she had been diagnosed with bipolar disorder, which testimony the trial court admitted for the limited purpose of credibility. *Id.* at 30-33.

Husband testified that on July 9, 2016, he woke up early to go to the flea market and to have breakfast. *Id.* at 40. Wife, who had not come home the night before, called and asked him to wait for her so they could go together. *Id.* at 40-41. When the parties returned home, Wife laid on the couch and Husband went out to work on crafts. *Id.* at 41. When Husband returned, Wife told Husband that Lori had called and wanted Wife to go out with her. *Id.* Husband told her, "Do you have to bring that up because we're having a nice day?" *Id.* Husband continued that he told Wife that they had a problem and needed to get help. *Id.* Wife put her fingers in her

- 5 -

ears while Husband was trying to talk to her and he pulled out one of her hands. *Id.* at 42. Husband stated that she "started carrying on" so he told her to get out. *Id.* Husband testified that he carried her last bag out for her and followed her because he was worried about her back and thought he would have to help with her bags. *Id.* Husband testified that Wife left for a couple days and then called him and asked if she could return, which she did. *Id.* at 43.

Husband testified that he has a permit to carry and occasionally wears his gun. *Id.* at 44. He explained that he was taught to always perform the slide action on firearms to make sure they are empty. *Id.* at 45. Husband further testified that he used to sleep with the gun under the mattress with the barrel facing the bottom of the bed, but since Daughter's family gave him a gun safe for Christmas in 2013 or 2014, he has not kept a gun under the bed. *Id.* Husband also testified that he has never used firearms to intimidate wife. *Id.* at 44.

Husband testified that on August 21, 2016, when he was out with Daughter and her family, he learned that Wife was not house-sitting two and one-half hours away as she had told him. *Id.* at 37-38. He stated that he sent her the picture of where she was staying to prove she had lied. *Id.* Husband admitted he told Wife he was so close he could throw a stone and hit her but stated that it was a bad choice of words and that it was a phrase that he used since he was a kid. *Id.* at 52.

Husband admitted that while he did throw Kool-Aid at Wife, they had been arguing and she had "upset my plate on my lap." *Id.* at 46. He also testified that this happened 25 to 30 years ago. *Id.* at 47. Regarding the computer incident, Husband testified that he was concerned about Wife using the computer because "some of the things that she was looking at at that time was I think for a 53-year-old grandmother is a little much, but, you know, that's her thing." *Id.* at 47-48.

Finally, Husband testified that he wanted to have this hearing held because his eight-year-old grandson starts hunting this year and, as Husband has been hunting for 42 years, Husband wanted to share this with his grandson. *Id.* at 48.

Daughter testified that on August 21, 2016, she was with Husband when he took the picture and throughout the subsequent telephone conversation. *Id.* at 59-60. Daughter also testified that what Husband had said to Wife was that he was so close he could throw a stone and hit the house, not Wife. *Id.* at 60. Daughter explained that it is an expression that Husband had used several times before. *Id.* at 61.

On November 28, 2016, the trial court entered an order denying Wife's PFA petition. On December 14, 2016, Wife filed a motion for reconsideration, which the trial court denied. Wife timely filed a notice of appeal.

Wife raises the following issues on appeal:

1. Whether the trial court erred as a matter of law and abused its discretion when it did not enter a final [PFA] order where the record established that [Husband] abused [Wife] as defined under the [PFA] Act[.]

2. Did the trial court abuse its discretion when it did not find [Wife]'s fear of [Husband] was reasonable despite evidence that he had threatened her, repeatedly followed her, plead guilty to harassing her[,] and often used guns to intimidate her?

3. Did the trial court err as a matter of law and abuse its discretion when it did not sustain an objection to lay testimony regarding [Wife]'s mental health status and considered the testimony for purposes of determining credibility of [Wife]?

Wife's Br. at 3 (full capitalization omitted).

## I.   *Proof of Abuse*

We address Wife's first two issues together.  Wife argues that the trial court abused its discretion in denying her PFA petition against Husband because she was subject to abuse under section 6102(a)(2) and (a)(5) of the PFA Act.  She claims that the evidence established that Husband's conduct during the marriage caused her to be in reasonable fear of bodily injury.

We review a trial court's grant or denial of a PFA petition for an abuse of discretion or an error of law.  *T.K. v. A.Z.*, 157 A.3d 974, 976 (Pa.Super. 2017).  When a claim is presented on appeal that the evidence should have resulted in an order of protection from abuse, "the reviewing court must 'view the evidence in the light most favorable to the verdict winner, granting [him or] her the benefit of all reasonable inferences.'"  *Mescanti v. Mescanti*, 956 A.2d 1017, 1020 (Pa.Super. 2008) (quoting *Fonner v.*

*Fonner*, 731 A.2d 160, 161-63 (Pa.Super. 1999)).  "The reviewing court then determines whether the evidence was sufficient to sustain the tr[ia]l court's conclusions."  *Id.*

The PFA Act's purpose "is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse."  *T.K.*, 157 A.3d at 976 (quoting *Buchhalter v. Buchhalter*, 959 A.2d 1260, 1262 (Pa.Super. 2008)).  "'In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury[,]' . . . [appellant's intent] is of no moment."  *Buchhalter*, 959 A.2d at 1263 (quoting *Raker v. Raker*, 847 A.2d 720, 725 (Pa.Super. 2004)).  Section 6102(a) defines "abuse" as:

> The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:
>
> . . .
>
> (2) Placing another in reasonable fear of imminent serious bodily injury.
>
> . . .
>
> (5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury. The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

23 Pa.C.S. § 6102(a).

Here, the trial court found that Wife failed to establish her allegations of abuse by a preponderance of the evidence. In reaching its conclusion, the trial court stated:

> It should be noted that several incidents of abuse alleged by [Wife] occurred during the early years of the parties' marriage. In the opinion of this Court, these incidents have lost their vitality, and should not be considered in the determination of whether [Husband]'s actions rise to the level of abuse as defined under 23 Pa.C.S. § 6102.
>
> During the hearing, [Husband] conceded that many of the alleged instances did, in fact, occur. However, [Husband] and [Husband]'s witness offered testimony that provided a competing rationale as to these alleged instances and their reason for occurring. [Husband] denied that he intended to cause fear in [Wife] and denied ever threatening [Wife] with physical violence.
>
> The [PFA] Act . . . is clear that actual injury need not occur to establish abuse but only that an individual was placed in fear of imminent serious bodily injury. Therefore, whether [Husband] intended to cause fear in [Wife] is not relevant. However, 23 [Pa.C.S. § 6102(a)(2) and (a)(5)] provide that, to establish abuse, the individual's fear of imminent serious bodily injury must be reasonable. Therefore, the determination of [Wife]'s credibility is of the utmost importance in this case.
>
> Having observed the demeanor and attitude of both parties, it is this Court's opinion that [Husband]'s testimony was generally more credible than that of [Wife] and that [Wife]'s testimony failed to establish a *reasonable*

- 10 -

fear of imminent serious bodily injury.[2] As a result, when [Husband]'s actions were considered as a whole and the totality of the circumstances, said actions do not rise to the level of abuse as defined under 23 Pa.C.S. § 6102. Therefore, [Wife]'s allegations of abuse were not established by a preponderance of the evidence.

Opinion, 1/4/17, at 2 (unpaginated) ("1925(a) Op.") (emphasis in original).

Based on our review of the record, the trial court's conclusion that Wife had not proven her allegations of abuse by a preponderance of the evidence, *see id.* at 3, was not an abuse of discretion.

Wife cites *Raker* and *Mescanti* to support her arguments that she was a victim of abuse under section 6102(a)(2) and (a)(5), respectively. These cases, which involved challenges to a trial court's finding of abuse, are inapposite. In *Raker*, we concluded that the evidence credited by the trial court supported a finding that wife was placed in reasonable fear of imminent serious bodily injury after wife testified that her estranged husband, who had threatened her in the past, entered her house at 2:00 a.m. wearing green socks on his hands and carrying a knife. *Id.* at 722, 726. In *Mescanti*, we concluded that the evidence was sufficient to establish a course of abusive conduct that placed wife in reasonable fear of bodily injury where wife testified that husband threatened her, prevented her from leaving the house, followed her while she was out with friends,

_____

[2] While the trial court opinion mentions only "serious bodily injury," the reasoning also supports the conclusion that Wife was not in fear of "bodily injury" under section 6102(a)(5).

- 11 -

cocked his guns in a manner to ensure that she would hear it, and wife saw him doing something under the hood of her car. **Mescanti**, 956 A.2d at 1021-22, 1024. While both cases found the evidence **sufficient** to support a PFA, neither case stands for the proposition that the trial court was **mandated** to credit the complainant's testimony and to issue a PFA.

Here, the trial court found that the events that occurred early in the marriage were too distant in time and "had lost their vitality." 1925(a) Op. at 2. It was within the trial court's discretion to assign less weight to these earlier events. **See Raker**, 847 A.2d at 726 ("If the trial court found the testimony to involve events too distant in time to possess great relevance to the case, it could certainly have assigned less weight to the testimony.") (quoting **Miller on Behalf of Walker v. Walker**, 665 A.2d 1252, 1259 (Pa.Super. 1995)). Moreover, it was also within its discretion to find "that [Husband]'s testimony was generally more credible than that of [Wife]." 1925(a) Op. at 2. In effect, Wife asks us to reject the trial court's credibility determinations, which we may not do. **See Brown v. Trinidad**, 111 A.3d 765, 770 (Pa.Super. 2015) ("The factfinder is free to believe all, part, or none of the evidence and to determine the credibility of the witnesses.") (quoting **Samuel-Bassett v. Kia Motors Am., Inc.**, 34 A.3d 1, 39 (Pa. 2011)).

When taking into account the trial court's findings and credibility determinations, along with the parties' testimony, we conclude that the trial court did not abuse its discretion in denying the PFA petition.

## II. *Admissibility of Evidence*

Next, Wife argues that the trial court abused its discretion by admitting lay witness testimony (her own) regarding Wife's mental health diagnosis. Wife contends that the trial court improperly relied on this evidence in reaching its determination that she failed to meet her burden of proof.

A trial court has broad discretion to admit or exclude evidence in PFA cases. *Buchhalter*, 959 A.2d at 1263. Additionally, we have held that the "[PFA] Act requires flexibility in the admission of evidence." *Hood-O'Hara v. Wills*, 873 A.2d 757, 761 (Pa.Super. 2005). We may only reverse a trial court's determination when it has committed a clear abuse of discretion. *Buchhalter*, 959 A.2d at 1263. Thus, an appellant must "show error in the evidentiary ruling and resulting prejudice." *Collins v. Cooper*, 746 A.2d 615, 620 (Pa.Super. 2000) (quoting *Romeo v. Manuel*, 703 A.2d 530, 532 (Pa.Super. 1997)).

During the PFA hearing, the following exchange occurred:

> [HUSBAND'S COUNSEL]: Now, [Wife], you have been under the treatment of a doctor for mental health issues, right?
>
> [WIFE'S COUNSEL]: Objection, relevance.

[HUSBAND'S COUNSEL]: Judge, it goes to her state of mind, certainly her credibility. I mean, she has a diagnosis. I think she'll tell us about it.

[WIFE'S COUNSEL]: Objection. This is not about her mental health diagnosis. This is about abusive conduct from one party to another.

[HUSBAND'S COUNSEL]: And while I agree with that, Judge, certainly if you let me lay a little bit of a foundation here, I think that if a party that's alleging abusive conduct does indeed have a diagnosis which may skew their perception of events, that that's certainly relevant.

[WIFE'S COUNSEL]: If we have a specialist, a doctor here to testify that a diagnosis has the potential to skew one's perspective of events, then put that expert on, but to open the door to where we have not gone and is irrelevant to the proceedings in a [PFA], I'm objecting.

[THE COURT]: I'm going to overrule it with the limited exception to credibility. If we get into [Wife]'s knowledge of what it is or isn't, if it gets beyond her scope of knowledge, but I think credibility, credibility is a big issue here with regard to all testimony and I'm going to allow the question, but I'd say get there quickly.

N.T., 11/23/16, at 30-31. Husband's counsel then asked Wife, "You were diagnosed with bipolar, right?" *Id.* at 32. Wife answered "Yes." *Id.*

Wife relies on ***Collins*** and ***In re Involuntary Commitment of Barbour***, 733 A.2d 1286 (Pa.Super. 1999), in support of her claim that lay testimony as to a disease or disorder is inadmissible. In both cases, we reversed based on a finding that the appellants had been prejudiced. ***See Collins***, 746 A.2d at 621; ***Barbour***, 733 A.2d at 1288. In ***Collins***, the sole issue at trial was damages, and we reversed because the erroneous admission regarding the plaintiff/appellant's diagnosis of temporomandibular joint dysfunction may have had an impact on the amount of the verdict.

- 14 -

*Collins*, 746 A.2d at 621. In *Barbour*, we concluded the trial court erred in admitting a lay witness's testimony that appellant was bipolar and posed a threat to himself, and concluded appellant was prejudiced because the evidence was used in establishing that involuntary commitment was necessary. *Barbour*, 733 A.2d at 1287-88.

Here, even if the trial court erred in admitting Wife's testimony about her own mental health diagnosis, Wife failed to establish prejudice. Other than the single question and answer quoted above, there is no reference to Wife's diagnosis anywhere in the PFA hearing. Neither Husband's counsel nor Wife's counsel mentioned it in their closing arguments, nor did the trial court either in its statement of reasons at the conclusion of the hearing or in its Rule 1925(a) Opinion. Instead, the trial court made its credibility determinations "having observed the demeanor and attitude of both parties." 1925(a) Op. at 2. Further, the trial court found that many of the alleged instances of abuse "had lost their vitality" given that they occurred during the early part of the 35-year marriage. *Id.* In sum, we discern no abuse of discretion.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 10/27/2017

- 15 -