J-S67019-19

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| W.J.B. OBO MINOR CHILDREN B.B. & C.B. | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| Appellant | : | |
| | : | |
| v. | : | |
| | : | |
| | : | No. 954 MDA 2019 |
| M.L.B. | : | |

Appeal from the Order Entered May 10, 2019
In the Court of Common Pleas of Lebanon County Civil Division at No(s):
2018-40218

BEFORE:   OLSON, J., DUBOW, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY DUBOW, J.:                    **FILED MARCH 09, 2020**

Appellant, W.J.B. ("Mother"), appeals from the May 10, 2019 Order that denied the Petition for Protection From Abuse ("PFA") Order that Mother filed on behalf of minor children B.B. and C.B. against M.L.B. ("Father") pursuant to the PFA Act, 23 Pa.C.S. §§ 6101-6117.  Upon careful review, we affirm.

Mother and Father are married, but currently separated, and are parents to 16-year-old B.B., 15-year-old M.B., and 7-year-old C.B.  Pursuant to a temporary custody agreement, Mother has primary physical custody of the children and Father has partial physical custody of children during some weekend days.  Father is a nineteen-year veteran of law enforcement and served simultaneously as a police officer in one borough and chief of police in a second locality.

---

[*] Former Justice specially assigned to the Superior Court.

On April 17, 2019, Mother filed a PFA Petition on behalf of B.B. and C.B. against Father, based upon an event that occurred on April 14, 2019, during a custody exchange at the paternal grandparents' home. In the PFA Petition, B.B. alleged that when she and her maternal grandmother were picking up C.B. from Father's custody, B.B. engaged in a verbal altercation with her paternal grandmother in Father's presence and Father brandished a gun, which scared B.B. Specifically, B.B. stated:

> My [maternal grandmother] was taking me to pick up [C.B.]. He was at my [paternal] grandparent[s'] house. When we got there, my [paternal] grandmother came out and told me to stop. She also told me that she did not want anything to do with me. I told her, "I am your granddaughter." [Father] came out and said that I[] "don't act like it." After this, [C.B] came outside and said goodbye to [Father]. While [C.B.] and I were walking to the car, I turned around and looked at [Father]. He gave me a dirty look, pulled his shirt up, and grabbed his gun. I did not see him pull it out of the holster. I grabbed [C.B.] and we ran to the car. When we got into the car, [C.B.]'s foot got caught in the door. I told my [maternal] grandmother what happened. She rolled her window down and asked [Father] if we needed to call the police. My [paternal grandmother] told her that we were on their property and [Father] told her to not speak to us. At this point I got scared and told her to leave. After we left, I called [Mother]. She told us to call 911. The police went and spoke to [Father]. They did not file charges against him because they considered it, "He said. She said." [Father] has threatened to kill me many times, especially when he was drunk. That is why I was afraid when he grabbed his gun.

PFA Petition, dated 4/17/19, at 2. In the PFA Petition, C.B. corroborated B.B.'s allegations, stating that he "saw [Father] pull his shirt up and show the gun" and C.B. proceeded to run to the car where his foot got stuck in the door. *Id.* at 3.

On the same day, after an *ex parte* hearing, the trial court entered a Temporary PFA Order against Father pending a hearing.

The trial court held hearings on April 26, 2019 and May 3, 2019 and heard testimony from 12 witnesses, including Mother; B.B.; C.B. (*in camera*); M.B.; the maternal grandmother; Police Officer Patrick McKinney; Father; the paternal grandparents; Father's girlfriend; T.C., fiancé of Father's oldest daughter; and D.B., Father's uncle.

During the hearing, Mother's witnesses and Father's witnesses presented a very different version of events leading up to and including the incident in question.

In sum, Mother testified that she was not present for the incident alleged in the Petition, but that afterwards B.B. called, was "hysterical[,]" and informed Mother that Father "showed his weapon[.]" N.T. Hearing, 4/26/19, at 5. Mother then advised B.B. to call the police. *Id.*

Mother also testified that during their 17 years of marriage, it was Father's habit to carry a firearm at all times. *Id.* at 6-7. Mother stated that, prior to their separation in July 2018, she witnessed Father drink alcohol in excess whenever he was not on duty and that he was often abusive when intoxicated. *Id.* at 9, 18-20. Mother described two incidents where Father attempted to choke B.B. and numerous times when Father threatened to kill B.B. *Id.* Mother testified that Father was intoxicated during all of the incidents, and that Father pleaded *nolo contendre* to the charge of Harassment Subject to Physical Contact with respect to one of the choking incidents. *Id.*

- 3 -

at 10, 18-20. Finally, Mother acknowledged that she recently pleaded guilty to two felony counts of Theft by Deception and was currently awaiting sentencing. *Id.* at 20.

B.B. testified that on the day of the incident, after she got in a verbal altercation with her paternal grandmother, Father nodded his head and widened his eyes, pulled up his shirt with his left hand, and moved his right hand and placed it on top of his gun. N.T. Hearing, 5/3/19, at 11-15. B.B. stated that she was scared, crying, and shaking. *Id.* at 16, 49.

B.B. stated that, to her knowledge, Father always has his gun with him and sometimes leaves it in the car, but she has never seen him pull it out and shoot it. *Id.* at 18, 37, 53. B.B. testified that Father physically abused and threatened her on numerous occasions when he was drinking and specifically described two separate incidents that occurred in December 2017 and May 2018 when Father grabbed and choked her. *Id.* at 20-21. B.B. stated that she wore makeup to cover up the bruises that occurred from the December 2017 incident. *Id.* at 22-23. B.B. explained that she never told anyone because she did not think anyone would believe her and she did not call the police because "[m]y dad is the police." *Id.* at 24; 30. B.B. testified that Father attended a "first responder rehab" in August 2018 and she had not seen him drink alcohol since then. *Id.* at 52. B.B. testified that she did not see Father drinking alcohol on the day of the incident, but that Father's gestures were similar to the gestures that Father made in other instances when he was intoxicated. *Id.* at 53.

C.B. testified *in camera.* There is no transcript of his testimony.

The maternal grandmother testified that when she drove B.B. to the paternal grandparents home to pick up C.B., and when B.B. ran back to the car with C.B., B.B. was "distraught" and told her to leave quickly because Father "just went for his gun." ***Id.*** at 57. The maternal grandmother further testified that Father often drinks in excess and there have been multiple incidents over the last 16 years where the kids, in fear, have contacted her to come get them when Father was drinking. ***Id.*** at 59-60, 62-63.

M.B. testified that, prior to his parents separating in August 2018, he often observed Father making threats to B.B. while Father was intoxicated, and he was scared of Father when Father was intoxicated. ***Id.*** at 68-74.

Officer McKinney testified that he responded to the scene and interviewed B.B. ***Id.*** at 75-76. B.B. explained to him that she and her paternal grandmother had a verbal altercation and then Father "made a face towards her and made a movement towards his right hip." ***Id.*** at 76. Officer McKinney testified that B.B. never told him that she saw a gun or that Father pulled a gun out. ***Id.*** at 76-77. Officer McKinney did not observe a gun on Father or smell alcohol on Father's breath. ***Id.*** at 78, 81-82.

Officer McKinney also testified that Father, paternal grandparents, Father's girlfriend, and "another young man" spoke to him "in mass" and stated that Father never left the doorway of the residence or interacted with B.B. ***Id.*** at 78, 83.

Father testified that, on the day of the incident, he spent the whole day with his family and girlfriend and that he did not have his gun on him, did not drink alcohol, and did not make any threatening gestures towards B.B. *Id.* at 92-97, 105, 111-12. Father stated that he heard the verbal altercation between B.B. and the paternal grandmother from the living room, walked to the doorway of the house, gave C.B. a kiss before he ran to the car, and went back into the house. *Id.* at 99-103. Father recalled being surprised when police arrived to question him. *Id.*

Father adamantly denied that he ever had a drinking problem, and testified that he only attended the rehab center in August 2018 to receive behavioral counseling and potentially repair his marriage. *Id.* at 106-08, 126-27. Father also denied ever physically abusing his children. *Id.* at 22. Father estimated that he had approximately two days per month where he did not have work or engage in a scheduled activity. *Id.* at 85. In particular, Father stated that he is employed by two different police forces; is a high school track and middle school wrestling coach; is a second lieutenant with the United States Air Force Auxiliary; is a member of Knights of Columbus and the Masonic Lodge; is the chairman for the township emergency services committee where he oversees two fire departments; and is a boy scout volunteer. *Id.* at 84.

The paternal grandparents, Father's girlfriend, and T.C. all testified that they were present for the incident and did not observe Father with a gun, drink alcohol in their presence, or make a threatening gesture to B.B. *Id.* at

136-78. In addition, the paternal grandparents testified that, to their knowledge, Father was not abusive and did not have a drinking problem. **Id.** at 139-50; 156-61. Father's uncle testified that he saw Father approximately twice a week and that he has never seen Father intoxicated and never saw Father with a concealed weapon off-duty. **Id.** at 180-85.

On May 10, 2019, the trial court filed an Opinion and Order, which denied Mother's PFA Petition.

Mother timely appealed. Both Mother and the trial court complied with Pa.R.A.P. 1925.

Mother raises the following issues on appeal:

1. Did the trial court err as a matter of law by denying [Mother]'s request for relief under the [PFA] Act despite finding that the protected minor children expressed credible fear of [Father]?

2. Did the trial court abuse its discretion by denying relief to [Mother] based upon a determination made as to the most recent incident of alleged abuse without addressing or considering past incidents of abuse testified to by [Mother]?

3. Did trial court err as a matter or law by considering, in its opinion, elements outside of those specifically required of [Mother] to prove under the [PFA] Act?

Mother's Br. at 4.

In a PFA action, this Court reviews the trial court's legal conclusions for an error of law or an abuse of discretion. **Custer v. Cochran**, 933 A.2d 1050, 1053-54 (Pa. Super. 2007) (*en banc*). A trial court does not abuse its discretion for a mere error of judgment, but rather "where the judgment is manifestly unreasonable or where the law is not applied or where the record

shows that the action is a result of partiality, prejudice, bias, or ill will." **Mescanti v. Mescanti**, 956 A.2d 1017, 1019 (Pa. Super. 2008) (citation omitted). Moreover, on appeal, this Court will defer "to the credibility determinations of the trial court as to witnesses who appeared before it. **Karch v. Karch**, 885 A.2d 535, 537 (Pa. Super. 2005). It is well-settled that "the trier of fact while passing upon the credibility of witnesses and the weight of the evidence produced, is free to believe all, part or none of the evidence." **Commonwealth v. Walsh**, 36 A.3d 613, 619 (Pa. Super. 2012) (citation omitted). Finally, we review the evidence of record in the light most favorable to, and grant all reasonable inferences to, the party that prevailed before the PFA court. **Snyder v. Snyder**, 629 A.2d 977, 982 (Pa. Super. 1993).

The purpose of the PFA Act is "to protect victims of domestic violence from those who perpetrate such abuse" and "its primary goal is advanced prevention of physical and sexual abuse." **Lawrence v. Bordner**, 907 A.2d 1109, 1112 (Pa. Super. 2006) (citation and internal quotation marks omitted). The PFA Act defines the term "abuse" in pertinent part as, "[p]lacing another in reasonable fear of imminent serious bodily injury." 23 Pa.C.S. § 6102(a)(2). When hearing evidence in a PFA case, "the court's objective is to determine whether the victim is in reasonable fear of imminent serious bodily injury[.]" **Raker v. Raker**, 847 A.2d 720, 725 (Pa. Super. 2004). The intent of the alleged abuser is "of no moment." **Id.** The petitioner must prove that "abuse" occurred by the preponderance of the evidence, which this Court has

defined as "the greater weight of the evidence, *i.e.*, to tip a scale slightly[.]" *Id.* at 724.

In her first issue, Mother avers that the trial court erred when it denied the entry of a PFA order despite the court's finding that, in her testimony regarding past incidences where Father was intoxicated, B.B. expressed credible fear of Father. Mother's Br. at 11. Mother argues that the trial court's findings incorrectly focused on whether a firearm was present and whether Father was intoxicated during the altercation as described in the PFA, when the correct analysis should have been whether Father placed B.B. in "reasonable fear of imminent serious bodily injury" pursuant to 23 Pa.C.S. § 6102(a) and whether B.B.'s fear was reasonable given the parties' history. *Id.* at 16.

Mother is correct in her assertion that, in its May 10, 2019 Opinion, the trial court made a finding that all three children "expressed credible fear of what their father could do when intoxicated." Trial Ct. Op., filed 5/10/19, at 9. However, the trial court also concluded that B.B.'s testimony regarding the incident in question was not credible. Specifically, the trial court found that it could not "accept B.B.'s description in [c]ourt of what occurred" because "[a]s it relates to what actually happened on April 14, [2019,] B.B.'s inconsistent statements wound her credibility." *Id.* at 11. The trial court rejected B.B.'s version of what occurred during the custody exchange, which includes her statements that she was afraid, and accepted Father's version that he was not

intoxicated and did not threaten B.B. with a gun. *Id.* at 13-14. The trial court opined that Mother's witnesses, as a whole, were less credible than the witnesses that Father presented:

> The key witnesses presented by [Mother] in support of her request for PFA Relief have credibility issues. [Mother] herself has plead[ed] guilty to theft. She abused the trust of youth sports groups to embezzle $50,000. This *crimin falsi* offense wounds her credibility. . . B.B. articulated three (3) materially different versions of the event in question, which wounds her credibility. The parties' youngest son, [C.B.] testified in such a hesitant and unconvincing manner that we found his testimony to be almost completely unbelievable.
>
> While we do not accept the totality of what [Father]'s family reported [(for example we do not accept the family's denial of [Father]'s alcohol problem)], Father's family members had far fewer credibility issues than did [Mother]'s witnesses. [Father]'s family was consistent in their testimony. Moreover, the testimony of [Father]'s family was corroborated by [T.C] and Officer McKinney. Stated simply, we found [Father]'s version of facts to be more credible than the version proffered by [Mother].
>
> By virtue of the above, we reject [Mother]'s theory about what occurred on April 14, 2019. Specifically, we do not believe that [Father] threatened B.B. with a gun.

Trial Ct. Op., filed 5/10/19, at 15.

The record supports the trial court's findings. As stated above, we defer to the credibility determinations of the trial court and the trial court is free to believe all, part, or none of the evidence. *See Karch*, 885 A.2d at 537; *Walsh*, 36 A.3d at 619. Accordingly, it was not an abuse of discretion for the trial court to make two distinct and opposing credibility findings, namely, that B.B.'s fear of Father on prior occasions when he was intoxicated was credible,

but that B.B.'s depiction of events during the custody exchange lacked credibility.

Because of the trial court's credibility findings, Mother's argument that the trial court failed to consider whether Father placed B.B. in "reasonable fear" pursuant to Section 6102 fails. Simply put, the trial court rejected B.B.'s version of the custody exchange, including the fear B.B. allegedly felt, and accepted Father's version that he was not intoxicated and did not threaten B.B. with a gun. As a result, the trial court made a finding that the allegations in the PFA Petition did not constitute "abuse" under Section 6102. We defer to the credibility findings of the trial court and, thus, reject Mother's argument.

In her second issue, Mother avers that the trial court abused its discretion when it failed to consider B.B.'s testimony concerning past incidents of serious physical abuse by Father when the court concluded that the incident in question did not rise to the level of "abuse" under the PFA. Mother's Br. at 20-21. The record belies Mother's claim.

This Court has held that, in a PFA proceeding, evidence about prior alleged abuse is "relevant to an understanding as to the reasonableness of [the petitioner]'s fear relative to the **present** petition." **Buchhalter v. Buchhalter**, 959 A.2d 1260, 1264 (Pa. Super. 2008) (emphasis added). This Court explained that after hearing evidence regarding past incidences of abuse, "the court is in a position to determine credibility and weight and properly determine the reasonableness of [the petitioner]'s alleged fear and

whether she proved by a preponderance of the evidence that the **present** alleged incidents rose to the level of abuse as defined by the PFA Act." ***Id.***

Here, the trial court permitted Mother, B.B., C.B., M.B., and the maternal grandmother to testify regarding Father's alleged past incidences of abuse while intoxicated. Based on that testimony, the trial court made a finding that "Father has a problem with alcohol abuse, and that his behavior when intoxicated can be unloving and unproductive." Trial Ct. Op., filed 5/10/19, at 10. The trial court further opined that, while it considered Father's past conduct, it could not issue a PFA Order based solely on Father's past conduct:

> Without question, [this court] considered the past relationship between [Father] and his children, and the conduct of [Father] that drove a wedge between himself and his children. [This court] did not and could not issue a PFA Order based exclusively upon those past incidents, nor were we prepared to base our analysis of the incident on April 14, 2019 entirely upon what had occurred in the past. Still, we did not, as [Mother] asserts, ignore the past history between [Father] and his children.

Trial Ct. Op., dated 7/15/19, at 3. As evidenced by its findings regarding Father's alcohol abuse, the trial court properly considered past incidents of abuse to analyze whether the **present** allegations in the PFA Petition rise to the level of abuse under the PFA Act. As stated above, we decline to reweigh the evidence or usurp the credibility determinations of the trial court. ***See Karch***, 885 A.2d at 537. Accordingly, we find no abuse of discretion.

In her third and final issue on appeal, Mother claims that the trial court erred when it considered, in its May 10, 2019 Opinion, the "life-altering

implications of declaring that abuse exists." Mother's Br. at 18 (citing Trial Ct. Op., filed 5/10/19, at 5). Mother argues that the trial court "established a de-facto balancing test, weighing the danger existing in a domestic violence environment with the life-altering implications of declaring that abuse exists" rather than determining if Mother demonstrated abuse under the PFA Act by a preponderance of the evidence. Mother's Br. at 18. This argument is devoid of merit.

In its May 10, 2019 Opinion, the trial court clearly articulated the applicable law and made a finding that the incident in question did not rise to the level of "abuse" under Section 6102 of the PFA Act. **See** Trial Ct. Op., filed 5/10/19, at 4, 10. Mother's effort to isolate a single sentence from the trial court's Opinion, out of context, is disingenuous. Our review indicates that the court did not create a balancing test or add a new element to the existing PFA Act. Rather, in its Opinion, the trial court included some *dicta*, which emphasized how difficult it was for the court to decide PFA cases, but explained that the court has a duty to follow the law:

> Discerning the difference between actionable abuse and the behavior that is unfortunate but insufficient to trigger PFA relief can be agonizingly difficult for a [c]ourt. At all times, we must be aware of the danger that inevitably exists in any domestic violence environment. At the same time, we also have to be cognizant of the sometimes life-altering implications of declaring that abuse exists. **Always, a [c]ourt must do its duty to follow the law as it exists as opposed to how we sometimes would want it to exist.** Accomplishing justice in a PFA arena can sometimes feel like "Mission: Impossible."

Trial Ct. Op., filed 5/10/19, at 5 (emphasis added). We find no error.

In sum, the trial court did not commit an error of law or abuse its discretion when it denied Mother's PFA Petition.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 03/09/2020