J-S09043-25

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| MARGARET HARTMANN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| THOMAS HARTMANN | : | |
| | : | |
| Appellant | : | No. 2896 EDA 2024 |

Appeal from the Order Entered October 15, 2024
In the Court of Common Pleas of Monroe County Civil Division at No(s):
006731-CV-2024

BEFORE: LAZARUS, P.J., BECK, J., and STEVENS, P.J.E.[*]

MEMORANDUM BY STEVENS, P.J.E.: **FILED APRIL 8, 2025**

Appellant, Thomas Hartmann, appeals from the October 15, 2024, order entered in the Court of Common Pleas of Monroe County granting a final order under the Protection from Abuse ("PFA") Act, 23 Pa.C.S.A. §§ 6101-6122, against him and for Appellee, Margaret Hartmann, for a period of six months.[1] After a careful review, we affirm.

_____

[*] Former Justice specially assigned to the Superior Court.

[1] There is no indication from the certified record that the trial court extended the PFA order beyond its expiration date. However, we decline to quash this appeal under the mootness doctrine. ***See Ferko-Fox v. Fox***, 68 A.3d 917 (Pa.Super. 2013) (opinion *per curiam*) (recognizing PFA orders are usually temporary and fall within the exception to the mootness doctrine of issues which may have important public policy considerations and are apt to elude appellate review).

The relevant facts and procedural history are as follows: Appellee and Appellant are married, and they have two minor children. On October 7, 2024, Appellee filed a PFA petition against Appellant and solely for herself. On that same date, the trial court entered a temporary PFA order against Appellant.

On October 15, 2024, the trial court held a hearing at which Appellant and Appellee, along with their respective attorneys, were present. During the hearing, Appellee testified she and Appellant are married; however, they are currently separated. N.T., 10/15/24, at 3. Specifically, the couple resided together with their children until Thursday, October 3, 2024, when Appellee asked Appellant "for a separation." *Id.*

Appellee explained that, at various times during her marriage, Appellant threatened her. *Id.* at 8. He called her "worthless," threatened to take their kids, and told her to kill herself. *Id.* He called her a "F'ing A-hole" in front of their young daughter, who then looked at Appellee and said, "Yes, mommy. You're a F'ing A-hole." *Id.* He also slapped her in the face on one occasion. *Id.* at 9.

Appellee testified Appellant has tracked her at various times during their marriage. On one occasion, she discovered the airflow in her vehicle seemed to be obstructed, and when she reached under the dashboard, she found a tracking device. *Id.* at 5. She confronted Appellant, and he admitted he placed the tracking device. *Id.*

Appellee testified she eventually relented to having the tracking device on her vehicle; however, Appellant then pulled it out and said, "I'm not tracking you anymore." *Id.* Thereafter, Appellee discovered Appellant was still tracking her via "Starlink." *Id.* Appellee clarified that "Starlink" is a GPS monitoring system on her Honda, and her husband's business pays for the GPS monitoring, so she has no access to stop the GPS monitoring. *Id.* at 15.

Appellee testified that, on Friday, October 4, 2024, she called Appellant and stated, "I am removing the last tracking device. Please do not follow me." *Id.* at 4. She indicated she turned off her "share" location on her cell phone. *Id.* at 14. She also asked him to stop texting her unless it was regarding the children. *Id.* at 7. She then went with a male friend to Lake Swiftwater later that same day to look at houses in a gated community. *Id.* at 4. After she did a walkthrough at a house, she drove to the gate and found Appellant waiting outside of the gate. *Id.* He positioned his vehicle to block Appellee from leaving to pick up their children at school. *Id.* Appellee indicated Appellant took photos of her and made accusations of infidelity. *Id.* at 6. Appellee indicated Appellant eventually moved his vehicle, and she retrieved the children from school. *Id.*

Appellee testified she and Appellant agreed Appellee would not come to the marital home that evening (October 4, 2024), and Appellee went to a "safe house" in Stroudsburg. *Id.* at 9. Appellee returned to the marital home late Saturday evening (October 5, 2024), and she slept in a chair until 3:00 a.m.

*Id.* at 16. Appellant then woke her and told her she could sleep in the bed. *Id.* Appellee indicated that, during the time she was in the bed, Appellant was not in it. *Id.*

Appellee left the marital home but arranged with Appellant to return later that evening (Sunday, October 6, 2024) to give both children their baths and put them to bed. *Id.* at 7, 17. Appellee indicated she "completed her daughter's bath, but immediately after that, [Appellant] chased [her] out of the house yelling. [Appellee] did not want to disrupt [her] children, so [she] just left. That night, [Appellant] called [her] at 8:30 p.m., which is an hour after [their] son's bedtime, and left a voice message of [their] son crying." *Id.* at 7.

Appellee testified that, after she asked Appellant to stop texting her, he continued to do so. *Id.* at 9. She indicated he "texted me twenty times after I asked him to stop" until he was served with the PFA petition. *Id.*

Appellee indicated that she believes Appellant is still tracking her. *Id.* She noted that, when she left the safe house on October 7, 2024, to file her PFA petition at the courthouse, she walked out of the safe house and saw Appellant "following [her] in his truck. Reving his engine. [She] had to run and hide. [She] was scared for her life. He was circling the blocks." *Id.* Appellee testified she was afraid that Appellant "was going to run over [her]." *Id.* at 19.

Appellee testified she is afraid of Appellant. *Id.* at 10. She testified she does not believe Appellant is a danger to their children, so she is seeking a PFA order solely for herself. *Id.* at 9. However, she noted that, since the time of the parties' separation, on one occasion when she visited the marital home, she saw in a closet "a large gun, with a loaded clip, stored together, where [her] children could reach it." *Id.* at 11.

On cross-examination, Appellee admitted that, when she looked at the property at Lake Swiftwater, her male friend accompanied her. *Id.* at 12. Appellee indicated that, as soon as Appellant saw her with a male friend, he began making accusations. *Id.* at 13. She noted Appellant "had many theories because of the [poor] cell reception. That's why he follows me[.]" *Id.*

Appellant also testified. He confirmed Appellee texted him and asked for a separation. *Id.* at 21. In the text, Appellee indicated she wanted to "separate and prioritize the two kids." *Id.* Appellant responded to the text with his own text "wishing her well." *Id.* Appellant indicated Appellee told him she was going to Lake Swiftwater on Friday, October 4, 2024, and he decided to go there uninvited to talk to her before she picked up the children. *Id.* Appellant confirmed Appellee told him earlier in the day that she was not sharing locations with him anymore, and she turned off her "share" on her cell phone. *Id.*

Appellant testified he arrived at the gated community and could not enter. *Id.* at 22. It then occurred to him that the Honda GPS was active, so he opened the app and saw Appellee's Honda was parked inside of the gated community. *Id.* at 23. He then walked into the gated community and found Appellee's Honda. *Id.* Appellant indicated he wondered, "How does her car get in the gated area?" *Id.* He then walked around the lake for about an hour, but he could not find Appellee. *Id.* He had a spare set of keys to the Honda, so he entered the Honda and drove around looking for Appellee. *Id.*

However, Appellant was unable to find Appellee, so he parked the Honda back where he found it. *Id.* at 24. Appellant indicated he went back to his vehicle, which was parked outside of the gate, and waited for Appellee. *Id.* He then saw a big truck pulling up to the gate, Appellee and a man exited the big truck, and Appellee hugged the man. *Id.* Appellant indicated Appellee then entered her Honda and drove to the gate to exit the community. *Id.* He confirmed he was "blocking the gate," and he yelled, "I see this is what's going on. You're cheating, you're having an affair." *Id.* Appellee responded that she wanted to get by so she could retrieve the children from school. *Id.*

Appellant testified he then went home, Appellee brought the children from school to the marital home, and Appellee left for the evening. *Id.* at 26. He indicated Appellee asked him to cancel the Starlink GPS for the Honda, and he did so on Saturday, October 5, 2024, at 11:27 a.m. *Id.* at 25-26. He noted that, after the incident at the lake, Appellee slept in a chair for a period

of time and then in a bed for a few hours during the weekend, so he questioned whether Appellee is really afraid of him. *Id.* at 27.

Appellant acknowledged that Appellee was at the house Sunday, October 6, 2024, to assist with the children. *Id.* at 28. He indicated that, after she left, the police came to the marital home for a "welfare check," and at this point, he was angry at Appellee. *Id.* He texted Appellee that if she "pulled anything like that again, [he] would not be so amicable." *Id.* at 29. He noted that, when the police arrived Sunday evening, the children were asleep, and the police left. *Id.*

Appellant admitted that, after he texted Appellee Sunday night, she told him to stop texting her. *Id.* He admitted that he texted her one more time to tell her that he had discovered her "male friend" was an alcoholic. *Id.* at 30. Appellant admitted he saw Appellee walking in Stroudsburg on Monday, October 7, 2024; however, he indicated it was a coincidence. *Id.* He testified he was in the area for work reasons when he saw her. *Id.* He denied revving his vehicle's engine or looping around to go by her a second time. *Id.* at 33.

Appellant's adult son, who is not Appellee's biological son, testified he was staying at his father's home during the weekend at issue. *Id.* at 42. He confirmed that Appellant and Appellee were not together often during the weekend; however, he witnessed a few verbal arguments between them. *Id.* at 43. He heard no threats of physical violence and witnessed no chasing by either party. *Id.* at 44.

Immediately after the hearing, the trial court filed an order on October 15, 2024, granting Appellee a final PFA order against Appellant and for herself. The PFA order was made effective October 15, 2024, to April 15, 2025. This timely, counseled appeal followed on October 25, 2024, and all Pa.R.A.P. 1925(b) requirements have been met.

On appeal, Appellant presents the following issues in his "Statement of the Questions Involved" (verbatim):

1. Did the Honorable Trial Court abuse its discretion in finding the evidence was sufficient to establish Appellee was in reasonable fear of bodily injury from Appellant?

2. Did the Honorable Trial Court abuse its discretion in finding the evidence was sufficient to establish a Final Order PFA for a period of six (6) months?

Appellant's Brief at 5 (suggested answers omitted).

In his first issue, Appellant claims the evidence was insufficient to support the trial court's final PFA order.

> The PFA Act does not seek to determine criminal culpability. A petitioner is not required to establish abuse occurred beyond a reasonable doubt, but only to establish it by a preponderance of the evidence. A preponderance of the evidence standard is defined as the greater weight of the evidence, *i.e.*, enough to tip a scale slightly.
>
> When a claim is presented on appeal that the evidence was not sufficient to support an order of protection from abuse, we review the evidence in the light most favorable to the petitioner and granting her the benefit of all reasonable inferences, determine whether the evidence was sufficient to sustain the trial court's conclusion by a preponderance of the evidence. This Court defers to the credibility determinations of the trial court as to witnesses who appeared before it.

**_B.K.P. v. J.R.B._**, 303 A.3d 456, 459 (Pa.Super. 2023) (citation omitted).

In the case *sub judice*, Appellee sought, and the trial court granted, a final PFA order against Appellant on the basis Appellant engaged in a course of conduct or repeatedly committed acts that placed Appellee in reasonable fear of bodily injury.

This Court has held that "[t]he purpose of the PFA Act is to protect victims of domestic violence from those who perpetrate such abuse, with the primary goal of advance prevention of physical and sexual abuse." **_Mescanti v. Mescanti_**, 956 A.2d 1017, 1022–23 (Pa.Super. 2008) (citation omitted). Relevantly, the PFA Act defines "abuse" as follows:

> **"Abuse."** The occurrence of one or more of the following acts between family or household members, sexual or intimate partners or persons who share biological parenthood:
>
> ***
>
> (5) Knowingly engaging in a course of conduct or repeatedly committing acts toward another person, including following the person, without proper authority, under circumstances which place the person in reasonable fear of bodily injury.[2]  The definition of this paragraph applies only to proceedings commenced under this title and is inapplicable to any criminal prosecutions commenced under Title 18 (relating to crimes and offenses).

---

[2] The PFA Act does not provide its own definition of "bodily injury" but adopts the definition from the Crimes Code. **See** 23 Pa.C.S.A. § 6102(b) ("Terms not otherwise defined in this chapter shall have the meaning given to them in 18 Pa.C.S.[A.] (relating to crimes and offenses.")). The Crimes Code defines "bodily injury" as "[i]mpairment of physical condition or substantial pain."  18 Pa.C.S.A. § 2301.

23 Pa.C.S.A. § 6102(5) (emphasis in original) (footnote added).

"In the context of a PFA case, the court's objective is to determine whether the victim is in reasonable fear of…bodily injury....Past acts are significant in determining the reasonableness of a PFA petitioner's fear." **B.K.P.**, 303 A.3d at 459 (citation omitted).

Here, in concluding Appellee met her burden of establishing abuse under Subsection 6102(5) by a preponderance of the evidence, the trial court specifically indicated it found Appellee's testimony, as well as her version of events, to be credible. Trial Court Opinion, filed 11/15/24, at 3.

Based thereon, the trial court determined Appellant knowingly engaged in a course of conduct or repeatedly committed acts toward Appellee, including following her without proper authority. **Id.** at 2-4. Specifically, the trial court found Appellant used tracking devices to keep track of Appellee's whereabouts, even after she asked him to stop doing so. **Id.** In this vein, the trial court noted that, after Appellee requested a separation, Appellant tracked Appellee to the gated community at Lake Swiftwater. **Id.** He was unable to drive into the gated community, so he exited his vehicle and walked around the gated community for at least an hour looking for her. **Id.** He used the GPS app linked to Appellee's Honda to find the specific location of her car, and he then used his spare key to drive her Honda around the community to look for her. **Id.** Unsuccessful, he returned to the gate to wait for Appellee.

***Id.*** When Appellee tried to leave the gated community, Appellant verbally confronted her and initially blocked her path. ***Id.***

Moreover, the trial court found Appellant tracked Appellee to her "safe house" location and observed her walking in the vicinity on her way to the courthouse. ***Id.*** at 2. The trial court believed Appellee's testimony that Appellant revved his vehicle's engine, circled the block, and followed her. ***Id.***

Additionally, the trial court found Appellant's course of conduct or repeated acts placed Appellee in reasonable fear of bodily injury. The trial court noted the parties' separation was "a volatile one," and Appellant's course of conduct was "menacing." ***Id.*** at 3. Given Appellee testified she was afraid of Appellant, and the circumstances support her testimony of "reasonable fear of bodily harm," we conclude the trial court did not abuse its discretion in this regard. ***See B.K.P.***, ***supra***. Accordingly, we conclude the trial court's final PFA order under Subsection 6102(5) is supported by sufficient evidence.

In his next claim, Appellant challenges the length of the PFA order. His entire argument in this regard is as follows:

> In the alternative, if this Court finds that Appellee was in reasonable fear of bodily injury, then a six-month PFA was improper. It is clear from the testimony that any alleged conduct occurred as a "heat of the moment" incident as Appellant learned his marriage had ended as a result of Appellee [having] a marital affair. Further, there was no allegation that a threat was made or any physical contact. As such, the Court should find that, at most, a brief two week cooling off period would be proper.

Appellant's Brief at 27.

- 11 -

Initially, as is evident, Appellant cites no authority in support of his assertion. *See T.K. v. A.Z.*, 157 A.3d 974 (Pa.Super. 2017) (finding the appellant's challenge to the duration of the PFA order waived for failing to develop the argument on appeal).

In any event, the trial court explained it imposed the six-month period to protect Appellee during the initial phases of separation, including as it relates to the parties making satisfactory arrangements for their minor children. Trial Court Opinion, filed 11/15/24, at 4. The trial court further noted Appellant's anger, his belief that Appellee was having an affair, and the "volatility" of the situation. *Id.* We find no abuse of discretion in this regard. *See Heard v. Heard*, 614 A.2d 255 (Pa.Super. 1992) (finding duration of protective order is subject to abuse of discretion standard of review and may only be overturned where the trial court's decision was manifestly unreasonable).

For all of the aforementioned reasons, we affirm the final PFA order.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 4/8/2025

- 12 -